1   Matthew Addison, Esq. (NSBN 4201)
    Sylvia Harrison, Esq. (NSBN 4106)
2   Sarah Ferguson, Esq. (NSBN 14515)
    MCDONALD CARANO LLP
3   100 West Liberty Street, 10th Floor
    Reno, Nevada 89501
4   Telephone: (775) 788-2000
    maddison@mcdonaldcarano.com
5   sharrison@mcdonaldcarano.com
    sferguson@mcdonaldcarano.com
6   *Attorneys for Plaintiff*

7               **UNITED STATES DISTRICT COURT**

8                    **DISTRICT OF NEVADA**

9

| | |
|---|---|
| 10  **NEVADA GOLD MINES LLC**, a Delaware Corporation, | Case No. 3:18-cv-00575-RCJ-WGC |
| 11 | |
| 12         Plaintiff, | |
| 13     vs. | |
| 14  **IMATECH SYSTEMS CYPRUS PTY LTD dba ARMORPIPE™ TECHNOLOGIES**, a foreign Corporation; **INTERNATIONAL MATERIALS & TECHNOLOGY PTY LIMITED dba IMATECH**, a foreign corporation**, IMATECH MANUFACTURING CENTRE PTY LTD** a foreign Corporation; **ARMORPIPE PTY LTD.**, a foreign corporation and **DOES 1 to 10**, inclusive | **STIPULATION TO FILE SECOND AMENDED COMPLAINT** |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20         Defendants. | |

21         Plaintiff, Nevada Gold Mines, LLC ("NGM") a Delaware limited liability company and

22  Defendants Imatech Systems Cyprus PTY Ltd dba Armorpipe^tm Technologies ("Imatech

23  Cyprus"), International Materials & Technology PTY Limited dba Imatech ("IM&T") Imatech

24  Manufacturing Centre Pty Ltd ("Imatech Manufacturing) and ArmorPipe Pty Ltd.

25  ("ArmorPipe"), without waiver of any defenses hereby stipulate as follows:

26         1.      NGM filed its original Complaint on December 4, 2018.

27         2.      NGM filed its First Amended Complaint on November 7, 2019.

28         3.      NGM now seeks to file a Second Amended Complaint.

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

1      4.      Without waiving any jurisdictional arguments or other defenses and pursuant to

2  FRCP 15(a)(2), Imatech Cyprus, IM&T, Imatech Manufacturing and ArmorPipe consent to

3  NGM filing its Second Amended Complaint, a copy of which is attached hereto as **Exhibit 1**.[1]

4      RESPECTFULLY SUBMITTED this 12th day of October, 2020.

McDONALD CARANO LLP            SANTORO WHITMIRE

/s/ Sarah Ferguson               /s/ James E. Whitmire
Matthew Addison, Esq. (NSBN 4201)     James E. Whitmire, Esq. (NSBN 6533)
Sylvia Harrison, Esq. (NSBN 4106)       10100 W. Charleston Blvd., Suite 250
Sarah Ferguson, Esq. (NSBN 14515)     Las Vegas, NV 89135
100 West Liberty Street. 10th Floor       Telephone:  (702) 948-8771
Reno, NV 89501                    Facsimile:  (702) 948-8773
Telephone: (775) 788-2000          jwhitmire@santoronevada.com
Facsimile: (775) 788-2020           *Attorneys for Defendants Imatech Systems*
maddison@mcdonaldcarano.com      *Cyprus PTY Ltd dba Armorpipe*tm
sharrison@mcdonaldcarano.com       *Technologies, International Materials &*
sferguson@mcdonaldcarano.com       *Technology PTY Limited dba Imatech, Imatech*
*Attorneys for Plaintiff*           *Manufacturing Centre Pty Ltd and ArmorPipe*
                                  *Pty Ltd.*

IT IS SO ORDERED.

*William G. Cobb*
UNITED STATES MAGISTRATE JUDGE

DATED: October 13, 2020.

---

[1] All jurisdictional objections are preserved by defendants.

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

**INDEX OF EXHIBITS**

| <u>**Exhibit**</u> | <u>**Description**</u> | <u>**Pages**</u> |
|---|---|---|
| 1 | Second Amended Complaint | 37 |

4816-2765-1278, v. 1

# Exhibit 1

# Second Amended Complaint

# Exhibit 1

1  Matthew Addison, Esq. (NSBN 4201)
   Sylvia Harrison, Esq. (NSBN 4106)
2  Sarah Ferguson, Esq. (NSBN 14515)
   MCDONALD CARANO LLP
3  100 West Liberty Street, 10th Floor
   Reno, Nevada 89501
4  Telephone:  775) 788-2000
   maddison@mcdonaldcarano.com
5  sharrison@mcdonaldcarano.com
   sferguson@mcdonaldcarano.com
6  *Attorneys for Plaintiff*

7              **UNITED STATES DISTRICT COURT**

8                  **DISTRICT OF NEVADA**

9

10  **NEVADA GOLD MINES LLC**, a Delaware        Case No. 3:18-cv-00575-RCJ-WGC
    limited liability company,
11
12           Plaintiff,
13       vs.
                                                 **SECOND AMENDED COMPLAINT FOR**
14  **IMATECH SYSTEMS CYPRUS PTY LTD**            **DAMAGES**
    **dba ARMORPIPE™ TECHNOLOGIES**, a
15  foreign Corporation; **INTERNATIONAL**        **(DEMAND FOR JURY TRIAL)**
    **MATERIALS & TECHNOLOGY PTY**
16  **LIMITED dba IMATECH**, a foreign
    corporation, **IMATECH MANUFACTURING**
17  **CENTRE PTY LTD** a foreign Corporation;
    **ARMORPIPE PTY LTD.**, a foreign
18  corporation and **DOES 1 to 10**, inclusive,
19
20           Defendants.

21        COMES NOW Plaintiff, Nevada Gold Mines LLC and through its counsel of record, and

22  for its causes of action, alleges as follows:

23                              **JURISDICTION**

24        1.     This Court has diversity jurisdiction over this litigation pursuant to 28 U.S.C. §

25  1332, as this is an action between a citizen of a State and citizens of a foreign state, in which the

26  amount in controversy exceeds $75,000.00, exclusive of interests and costs.

27                                **VENUE**

28        2.     Venue is proper pursuant to 28 U.S.C. 1391(b)(2), as a substantial part of the events

1   giving rise to the claim occurred and a substantial part of the property which is the subject of this
2   action is situated in the District of Nevada.

3     3. As discussed in more detail below, Defendants are not meaningfully separate
4   entities, but to the extent the Court finds they are separate for purposes of jurisdiction, Imatech
5   Systems Cyprus Pty Ltd, dba ArmorPIPE Technologies ("Imatech Cyprus"), Defendant
6   International Materials & Technology Pty Limited dba Imatech ("IM&T"), Defendant ArmorPIPE
7   Pty Ltd ("ArmorPIPE"), and Defendant Imatech Manufacturing Centre Pty Ltd ("Imatech
8   Manufacturing," collectively "Defendants") purposefully availed themselves of the benefits and
9   protections of Nevada law by marketing products in Nevada and contracting to supply goods in
10  the State and District of Nevada, from which this cause of action arises, so this Court may exercise
11  personal jurisdiction over Defendants.

12         **PARTIES**

13    4. Plaintiff, Nevada Gold Mines LLC ("NGM" or "Plaintiff"), is a Delaware
14  corporation headquartered in Denver, Colorado. NGM is licensed to do business in Nevada, and
15  at all times relevant to this action owned and operated a gold mine near Carlin, Nevada where the
16  events that gave rise to this suit occurred.

17    5. Defendant Imatech Cyprus, is a foreign corporation incorporated under the laws of
18  Cyprus.  ArmorPIPE Technologies' registered office in Cyprus is located at 61-63 Lordou
19  Vyronos, Lumiere Building, Flat 601-602, 6023, Larnaca, Cyprus.

20    6. Defendant IM&T is incorporated under the laws of Australia. Imatech's corporate
21  headquarters and principal place of business are located at Unit 7/6 Gladstone Road, Castle Hill,
22  NSW 2154, Australia.

23    7. Defendant ArmorPIPE is a foreign corporation incorporated under the laws of
24  Australia. ArmorPIPE's head office and principal place of business are located at Unit 7/6
25  Gladstone Road, Castle Hill, NSW 2154, Australia.

26    8. On information and belief Defendant Imatech Manufacturing Centre Pty Ltd is a
27  foreign corporation incorporated under the laws of Australia.  Its principal place of business is
28  3/13 Nelson Rd, Cardiff, NSW, 2285, Australia.

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

9.      IM&T, ArmorPIPE, Imatech Cyprus, and Imatech Manufacturing are collectively referred to herein as "Imatech Defendants."  For the purposes of this Complaint, NGM uses the term "Imatech" when it is unable to attribute an allegation to a specific Imatech Defendant.

10.      On information and belief, Imatech Cyprus, ArmorPIPE, and Imatech Manufacturing are subsidiaries of IM&T, and are controlled by IM&T.

11.      At all relevant times, IM&T, Imatech Cyprus, and ArmorPIPE collectively designed, sold, distributed, supplied, installed, and inspected ArmorPIPE 9200 Series, ceramic lined surface borehole piping for NGM's Turf and West Leeville Paste Project near Carlin, which were manufactured by Imatech Manufacturing.

12.      At all relevant times, Imatech Cyprus and ArmorPIPE acted as agents for IM&T and are alter egos of IM&T.

## FACTUAL ALLEGATIONS

### Relevant Information Regarding The Ownership Of The Imatech Defendants

13.      Mr. Warwick John Rule ("Mr. Rule") is the sole director and sole company secretary of each of IM&T, Imatech Manufacturing, and ArmorPIPE. Mr. Rule is a director of Imatech Cyprus.

14.      Mr. Rule and Mrs. Helen Rule are the directors of Eekoyenia Pty Ltd. ("Eekoyenia"). Mrs Rule is also the sole company secretary of Eekoyenia.

15.      Eekoyenia is the owner of 100% of the shares in Imatech Manufacturing and ArmorPIPE and 100% of the E class shares in IM&T. Mr. Rule is a 99.02% shareholder of the ordinary shares in that company and Mrs. Helen Rule is a 0.98% shareholder of the ordinary shares in that company.  Eekoyenia's registered office is 7/6 Gladstone Road Castle Hill NSW 2154 – the same as Imatech Manufacturing and ArmorPIPE's.

16.      Mr. and Mrs. Rule are the shareholders (each owning one share) in Eekoyenia.

17.      The directors of Imatech Cyprus are Warwick John Rule, Despoina Christodoulou; and Loukia Kounna.

18.      On information and belief, the sole shareholder in Imatech Cyprus is a trustee called W.J. Rule International Trust Limited, registered in Cyprus and identified as a "*mutual and*

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

*pension fund, nominee, trust, trustee*." The "*beneficial owners*" of W.J. Rule International Trust Limited are identified as "Mr. and Mrs. Warwick John Rule."

19.     On information and belief, Mr. Rule is the "Global Ultimate Owner" of Imatech Cyprus. On information and belief, Imatech Cyprus is a "***controlled subsidiary***" in reference to the ownership of Imatech Cyprus's shares by W.J. Rule International Trust Limited.

20.     On information and belief, IM&T conducted its Australian and international business under its name, until 2009 when Defendants ArmorPIPE and Imatech Manufacturing were formed as separate corporations.

**The Day-To-Day Operations Of The Imatech Defendants**

21.     The employees of the Imatech Defendants provide services to all four Imatech Defendants, and the performance of such services is not tracked internally.

22.     IM&T provides administrative services for all of the Imatech Defendants.

23.     On information and belief, Imatech Defendants share a common Chief Executive Officer, Russell Eggers.

24.     IM&T, ArmorPIPE, and Imatech Cyprus all share the same domain name: imatech.com.au.

25.     On information and belief, Defendants' employees all have the same email address suffix: @imatech.com.au.

26.     Many of the flyers, email signature blocs, advertisements, and agreements between the parties refer only to "Imatech." The other companies are rarely, if ever, mentioned by name.

27.     IM&T's Facebook page is titled "Imatech – International Materials and Technology Pty Ltd."

28.     IM&T advertises ArmorPIPE technologies on its Facebook page:

Protective Pipeline Systems:  ArmorPIPE® Technologies is a leader in providing engineered abrasion resistant piping systems to the mining and mineral processing sectors. ArmorPIPE® was born as a result of industry demand for reliable abrasive slurry handling solutions.  The proprietary pipe-lining technology was developed with the aim of creating a system solely for the purpose of providing exceptional levels of resistance to abrasion, protection from corrosion and erosion in pipe bends and associated fillings.  Applications include, but are not limited to, the transportation of tailings, process slurries, shotcrete, coal cemented aggregate backfill and pneumatic conveying of dry materials.

The Facebook page then directs visitors to the ArmorPIPE Technologies website, which has the same language as IM&T's Facebook page. ArmorPIPE's head office is listed as the same address as IM&T's headquarters.

29.     The ArmorPIPE™ Trademark is owned by International Materials & Technology Pty Ltd.

30.     IM&T is the applicant and owner of an Australian patent for "Improved wear liner," effective December 17, 2015.  "Warwick Rule" is listed as an inventor of this invention, which "relates to ceramic wear liners on a steel base plate."

31.     Imatech Cyprus made numerous contacts soliciting business from Barrick Gold Corporation ("Barrick") for its Goldstrike Mine in Nevada.  Barrick's point of contact at Imatech was Glenn MacGregor who, according to his signature block, worked for "IMATECH ArmorPIPE Technologies."

32.     On information and belief, the primary function of Imatech Cyprus is the distribution of products developed and designed by IM&T and ArmorPiPE and manufactured by Imatech Manufacturing or other Australian subsidiaries of IM&T.

**Imatech's Deliberate Business Contacts In Nevada**

33.     As early as 2005, employees of IM&T began visiting Nevada to attend trade shows and market IMATECH products.

34.     In May and June of 2012, salesmen holding themselves out as representatives of "IMATECH" or ArmorPIPE visited Nevada to market IMATECH or ArmorPIPE products and made contact with Newmont employees to market "abrasion resistant" ArmorPIPE ceramic-lined pipes.

35.     Between 2012 and 2015 salesmen holding themselves out as representatives of "IMATECH" or "ArmorPIPE" made numerous trips to Nevada, including in the Elko area, to attend trade shows and to market products to mining companies.  These trips included several visits to Newmont's Elko office and to its Leeville site to discuss the possible use of ArmorPIPE ceramic-lined pipe in the delivery of paste for the underground mine.

36.     From 2012 to 2015, employees of ArmorPIPE continued to solicit business from

Newmont, made numerous representations to Newmont concerning the durability of the ArmorPIPE ceramic pipe in the paste delivery application, and provided on-going advice concerning the configuration of the pipe system to optimize the performance of the ceramic pipes.

37.   During all times in communicating with Newmont until January of 2015, ArmorPIPE's employees presented themselves as representing "IMATECH," "ArmorPIPE," and/or "ArmorPIPE Technologies."  ArmorPIPE employee Glenn MacGregor testified this was done in order to enhance the brand recognition of the IMATECH and ArmorPIPE names.

**NGM's Leeville Past Project Site**

38.   At all times relevant to this action, NGM owned and operated an underground gold mine 29 miles north of Carlin, Nevada, a where the Leeville Paste Project Site is located.  The Leeville Paste Project makes cemented pastefill to provide geotechnical support for mined stopes and other areas of the Leeville mine.  The pastefill is a slurry mixture of excavated mill tailings from the nearby Mill 4-2 Tailing Storage Facility, crushed aggregate, process water and binder.

39.   The Leeville Paste Project pumps pastefill into the underground mine via pipelines installed in surface-drilled boreholes.  The boreholes connect to an underground distribution piping system that delivers the pastefill to the mining stopes requiring backfill for geotechnical support.  Each cased borehole contains a ceramic-lined carbon steel pipe for paste transport. Robust ceramic lining in the walls of these pipes is essential as the pastefill is abrasive and over time, will abrade the material it contacts in the pipes.

40.   In developing Leeville Paste Project, NGM sought the supply of various materials required for the project, including ceramic lined piping.

**Imatech Responds To NGM's Request For Bid**

41.   On January 15, 2015, NGM solicited a request for quote, RFQ-00005-2015 ("RFQ"), for carbon steel pipes with ceramic lining for surface borehole piping at its Leeville site.

42.   NGM informed potential bidders that there was "**no erosion/corrosion allowed for steel pipe wall.**"

43.   On January 27, 2015, Glenn MacGregor transmitted a bid quotation to NGM on letterhead describing the respondent as Imatech Systems Cyprus PTY Ltd trading as

ArmorPIPE™ Technologies. It lists the "Registration Office" as the Cyprus address.   Mr. MacGregor has testified that international sales (outside of Australia) of the IMATECH products were made through the Cyprus entity.  This bid quotation was the first time the existence of Imatech Cyprus was disclosed to NGM.

44.    In the bid, the email address is imatech@imatech.com.au, and the web address is listed as www.imatech.com.au. The Scope of Work is described in part as "Manufacture and Supply Surface borehole piping for the Turf and West Leeville Paste Project."  The bid includes an express warranty from IMATECH regarding the quality and fitness of the product.  On information and belief, "IMATECH" in this instance refers to IM&T.

45.    The bid included the manufacture and supply of ArmorPIPE 9200 Series, ceramic lined surface borehole piping, for NGM's Turf ("L5 borehole") and West Leeville Paste Project ("L4 borehole").   The bid states the schedule for the manufacture of the pipes would be subject to "IMATECH's manufacturing load," and that the pipes would be shipped from the address:

IMATECH
Unit 3 Nelson Road
Cardiff NSW 2285

46.    When asked about performance issues with the ArmorPIPE at other mines, Imatech Defendants' representatives stated that the "slack flow" issues at other mines would not be a problem at Leeville if the delivery boreholes were drilled at an angle from vertical; NGM followed this recommendation.

47.    Imatech Defendants' salesmen represented to NGM that the ArmorPIPE products would last the "life of the mine" and would not need to be replaced.   Imatech Defendants' salesmen presented NGM with testimonials from other mines regarding the durability of the ArmorPIPE product.

48.    After several exchanges of documents clarifying the bid, NGM issued a service order to Imatech Systems Cyprus Pty Ltd for 9200 Series ArmorPIPE™ pipes and fittings for the Leeville Paste project.

49.    On February 10, 2015, NGM accepted this bid, and on February 19, 2015, Plaintiff issued a Purchase Order Change to Imatech Cyprus (**Exhibit A**). NGM's purchase order to

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

1   Imatech Cyprus incorporated by reference its Service Terms and Conditions (**Exhibit A.1**). The

2   Purchase Order Change and the Service Terms and Conditions are referred to collectively as the

3   "Agreement."

4          50.     According to Section 2(B) of the Service Terms and Conditions, the Supplier

5   warranted that:

6          (i) it is fully competent and possesses the requisite skill, knowledge, resources,
       experience and expertise to perform the Services in accordance with the standards
7      and the degree of skill and judgment which is normally exercised in the United
       States mining and metals industry and other relevant industry by those engaged in
8      the performance of services similar in nature to the Services, (ii) the Services shall
       be performed in accordance with said standards, skill and judgment, (iii) the
9      Services shall be performed in strict compliance with the requirements of this
       Agreement, including any specifications set forth in the Service Order
10     ("Specifications" as applicable to Services), (iv) all Services performed shall be
       free from defect, (v) all equipment, supplies, and other tangible materials to be
11     incorporated into the Services by Supplier and thereafter owned by NGM, as
       specified in the Service Order (the "Equipment"), shall be in conformance with any
12     specifications applicable thereto as set forth in the Service Order (Specifications"
       as applicable to the Equipment) and be free from defects and of standard quality
13     for the industry unless otherwise agreed in a written document signed by NGM. . .

14         51.     In addition, NGM issued two separate service orders to Imatech Cyprus for an

15   Imatech quality assurance/quality control representative for inspection and installation of the

16   Imatech piping.

17   **Shipment and Installation Of ArmorPIPE™ 9200 Pipes At Leeville**

18         52.     After the Agreement was executed, Imatech Cyprus was required by NGM to fill

19   out a "Supplier Pre-Qualification Questionnaire." The questionnaire described the company's

20   business activities as follows: "The principal activity of the company is the distribution of

21   engineering products."  The project manager is listed as Jessica Stevenson, with address 7/6

22   Gladstone Road, Castle Hill, NSW 2156, Australia.

23         53.     During March and April 2015, a series of engineered drawings of 9200 Series

24   ArmorPIPE™ were produced for "West Leeville" by "IMATECH" with address 7/6 Unit 7/6

25   Gladstone Road, Castle Hill, NSW 2154, Australia.  On information and belief, "IMATECH" in

26   this instance refers to IM&T.

27         54.     On information and belief, the pipes were manufactured by Imatech

28   Manufacturing.

55.     In June and early July 2015 several shipments of pipe were sent to Leeville.  At least one bill of lading listed International Materials and Technology as the consignor.  Another listed the consignor company name as "Imatech Systems Cyprus" and the shipper/pick-up address as "Imatech Manufacturing Centre Pty Ltd 3/13 Nelson Road, Cardiff NSW 2285, Australia."

56.     An Order Status Summary issued by the shipping broker, McHugh & Eastwood, described five shipments for NGM's order with each container number matching container numbers from the packing lists and bills of lading.  The supplier listed on the Order Status Summary is International Materials & Technology and the buyer is listed as Leeville Pastefill Project.

57.     On September 29, 2015, IM&T consigned a shipment of Goldend [sic] Paste to NGM for the Leeville Paste Project, shipped via FedEx.

58.     NGM issued additional separate service orders to Imatech Cyprus for an Imatech quality assurance/quality control representatives to travel from Australian to conduct inspection and oversight of the installation of the Imatech piping.  Imatech oversaw the installation of the ceramic lined pipes purchased by NGM at Plaintiff's L4 borehole and L5 boreholes.

59.     Imatech oversaw the installation of the ceramic lined pipes purchased by NGM at Plaintiff's L4 borehole and L5 borehole during the first months of 2016.

60.     Imatech employees directly managed certain aspects of pipe parts and paste deliveries to the Leeville project, including Owen Wem, described as "Special Projects Engineer, IMATECH" (contact information identical to IM&T), and Philip Holliday, described as "Inventory and Logistics Manager, IMATECH" (contact information identical to IM&T).  On information and belief, Owen Wen and Philip Holliday are employees of IM&T.

61.     Imatech inspected its piping for the L5 borehole in February 2016 and its piping for the L4 borehole in July, 2016, but did not report any issues to NGM.

**The Failure Of The ArmorPIPE™ 9200 Pipes At Leeville**

62.     On October 31, 2017, NGM experienced water pressure build up in the L5 paste line. Upon investigation, it was determined that there was damage to the pipe, liner, and grout. Subsequently, NGM examined the L4 line and determined that there was also unusual wear and

deterioration of that line.

63.     On or about November 3, 2017, NGM notified Imatech of the failure of the ceramic lining of the pipe resulting in a hole in the metal pipe, as well as in the drill hole casing. The piping at issue had been in service for less than a year. The failure of the ceramic lining caused a hole in the steel pipe and significant damage to the borehole casing and the borehole itself.

64.     Following the pipe failure, ArmorPIPE and IM&T representatives made numerous trips to Nevada to investigate the failure of the pipes, including meeting with NBM personnel, taking videos of the pipe interior, and collecting samples of the pipes to subject to testing in Australia.

65.     On information and belief, representatives of each of the Imatech Defendants, including Mr. Rule and Russell Eggers, conferred together to attempt to determine the cause of the pipe failure.  On information and belief, Imatech Defendants' representatives concluded the cause was an error in the formulation of the resin comprising a component of the lining material.

66.     The malfunction of the ArmorPIPE 9200 Series ceramic lined pipes used at NGM's L4 and L5 boreholes is a result of a design and/or manufacturing defect.  Imatech Defendants knew or should have known that this manufacturing and/or design defect would cause the pipes to malfunction.

67.     Imatech Manufacturing did not perform regular quality control testing on its ceramic-lined pipes until after the pipe failure at the Leeville site.  Subsequently, Imatech Manufacturing instituted new quality control measures to prevent future failures like this one.

68.     The design and/or manufacturing defect that caused the ArmorPIPE 9200 Series ceramic lined pipes to fail resulted in significant damages to NGM. The defects rendered the pipes useless, causing the mine's operations to be stopped until a substitute backfill system could be employed.  The inability to utilize paste backfill required a change in the mine plan and caused a significant reduction in production revenues until replacement paste delivery pipes could be installed.  NGM was forced to remove the ceramic lining and replace the pipes and to repair the significant damage to LS5 borehole itself, causing further delays in the mine's operation and significant expenses.  As a result of the pipe's failure, NGM lost revenue and suffered other

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

incidental and consequential damages estimated to be in excess of $6,500,000.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Strict Product Liability – Defective Product

### As to DEFENDANTS

### IM&T, IMATECH CYPRUS, ARMORPIPE, IMATECH MANUFACTURING

69.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

70.     Imatech Defendants designed, manufactured, sold and/or distributed defective ArmorPIPE 9200 Series ceramic lined pipes to NGM.

71.     The ArmorPIPE 9200 Series ceramic lined pipes that Imatech Defendants designed, manufactured, sold and/or distributed were defective in their design. Further, the ArmorPIPE 9200 Series ceramic lined pipes were defective when they left Imatech Defendants' possession and control.

72.     Imatech Defendants knew, or should have known, that the ArmorPIPE 9200 Series ceramic lined pipes contained a non-obvious danger in their manufacture and design, and were highly susceptible to failure.

73.     The ArmorPIPE 9200 Series ceramic lined pipes were used in a manner which was reasonably foreseeable by Imatech. Imatech oversaw the installation of the pipes, and also inspected the pipes after they were in use at Plaintiff's mine for several months. Imatech Defendants failed to inform Plaintiff as to the pipes' susceptibility to failure and warn them to replace the pipes.

74.     The ArmorPIPE 9200 Series ceramic lined pipes designed, manufactured, sold and/or distributed by Imatech Defendants were defective due to inadequate warnings, inadequate inspection and testing, and inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

75.     Had Plaintiff been adequately warned about the likelihood that Imatech's ceramic lined pipes would fail, it would have taken steps to avoid damages by removing and replacing the

1    pipes.

2    76.    As a direct and proximate result of the defective condition of the ArmorPIPE 9200

3    Series ceramic lined pipes as designed, sold and/or distributed by Imatech Defendants, NGM has

4    suffered damages, including property damage to its L4 and L5 boreholes, presently exceeding

5    $6,500,000, for which Imatech Defendant are jointly and severally liable.

6                           **SECOND CAUSE OF ACTION**

7                           **Breach of Express Warranty**

8         **As to DEFENDANTS IM&T, IMATECH CYPRUS AND ARMORPIPE**

9    77.    Each of the preceding paragraphs is incorporated by reference as though fully set

10   forth herein.

11   78.    IM&T, Imatech Cyprus, and ArmorPIPE expressly represented and warranted to

12   Plaintiff by and through oral and written statements, descriptions, and affirmations of fact in

13   product advertisements, marketing materials, its web site, and other written materials intended for

14   the general public, that the ArmorPIPE 9200 Series ceramic lined pipes were safe and fit for their

15   proper and intended uses, and that the pipes contained no defects in material or workmanship.

16   79.    IM&T, Imatech Cyprus, and ArmorPIPE made these affirmative statements to

17   NGM, and understood that the nature of their warranty and the quality of their design and

18   workmanship were unavoidably material to Plaintiff.

19   80.    These express warranties related to and covered qualities and features of the

20   ArmorPIPE 9200 Series ceramic lined pipes that were unavoidably material to NGM.

21   81.    Plaintiff relied upon the express warranties of IM&T, Imatech Cyprus, and

22   ArmorPIPE in purchasing the ArmorPIPE 9200 Series ceramic lined piping.

23   82.    At the time they made these express warranties, IM&T, Imatech Cyprus, and

24   ArmorPIPE knew the purposes for which the ceramic lined pipes were intended to be used, and

25   warranted the piping as safe and fit for such purposes.

26   83.    The ArmorPIPE 9200 Series ceramic lined pipes purchased by NGM did not

27   conform to the promises, descriptions, or affirmations of fact of IM&T, Imatech Cyprus, and

28   ArmorPIPE because the pipes are not free from defects in materials and/or design. The defective

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

design and/or manufacturing of the ceramic lined pipes caused them to be highly susceptible to failure. As a result, the ArmorPIPE™ 9200 Series pipes failed approximately a year after they were installed, causing damage to boreholes L4 and L5 as well as significant delays in the mining operations. This damage occurred during the warranty period entirely disproportionate to the age of the piping.

84. NGM has incurred damages as described herein as a direct and proximate result of the misrepresentations of IM&T, Imatech Cyprus, and ArmorPIPE in their express warranties, for which IM&T, Imatech Cyprus, and ArmorPIPE are jointly and severally liable.

### THIRD CAUSE OF ACTION

### Breach of Implied Warranty

### As to DEFENDANTS IM&T, IMATECH CYPRUS, ARMORPIPE, AND IMATECH MANUFACTURING

85. Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

86. By operation of law, IM&T, Imatech Cyprus, ArmorPIPE, and Imatech Manufacturing impliedly warranted to NGM that the ArmorPIPE 9200 Series ceramic lined pipes were of merchantable quality and fit for the ordinary purposes for which the pipes were intended to be used.

87. IM&T, Imatech Cyprus, ArmorPIPE, and Imatech Manufacturing held themselves out and represented to NGM as being competent and qualified professionals, capable of selling, installing, servicing, testing, maintaining, repairing, and inspecting the ceramic lined pipes after their sale to NGM.

88. Based upon the representations of IM&T, Imatech Cyprus, ArmorPIPE, and Imatech Manufacturing, NGM purchased ArmorPIPE 9200 Series ceramic lined pipes from Imatech, and retained the services of Imatech to sell, install, service, maintain, test, repair, and inspect the pipes.

89. IM&T, Imatech Cyprus, ArmorPIPE, and Imatech Manufacturing is a merchant with respect to ArmorPIPE 9200 Series pipes.

90. IM&T, Imatech Cyprus, ArmorPIPE, and Imatech Manufacturing, through their

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

1   representations of competency, made certain implied warranties that their services would be

2   performed in a fit, workmanlike and competent manner.

3        91.     IM&T, Imatech Cyprus, ArmorPIPE, and Imatech Manufacturing breached the

4   foregoing warranties as the ArmorPIPE 9200 Series ceramic lined pipes installed at NGM's L4

5   and L5 boreholes were neither fit nor merchantable nor safe for the reasons set forth in the

6   preceding paragraphs.

7        92.     As a direct and proximate result of the breach of implied warranty by I IM&T,

8   Imatech Cyprus, ArmorPIPE, and Imatech Manufacturing, NGM has incurred damages to its

9   property, together with the costs incurred to purchase the defective ArmorPIPE 9200 Series

10  ceramic lined pipes, and to subsequently replace the pipes after they failed, for which IM&T,

11  Imatech Cyprus, and ArmorPIPE are jointly and severally liable

12                       **FOURTH CAUSE OF ACTION**

13                         **Negligent Misrepresentation**

14          **As to DEFENDANTS IM&T, IMATECH CYPRUS AND ARMORPIPE**

15       93.     Each of the preceding paragraphs is incorporated by reference as though fully set

16  forth herein.

17       94.     IM&T, Imatech Cyprus, and ArmorPIPE are in the business of manufacturing

18  piping systems to the mining and mineral processing sectors, including the ArmorPIPE9200.

19  Imatech marketed the ArmorPIPE 9200 as "abrasion resistant" and as having an "optimum system

20  life" extending substantially longer than competitors' products estimated life of 18 months and up

21  to 10 years.

22       95.     Moreover, during the bidding process, IM&T, Imatech Cyprus, and ArmorPIPE

23  represented to NGM that due to the ArmorPIPE 9200's durability and extended system life,

24  installation of the ArmorPIPE 9200 at L4 and L5 would significantly reduce NGM's service and

25  maintenance costs.

26       96.     This information was supplied to NGM to guide its decision in choosing a piping

27  system for L5 and L4.

28       97.     IM&T, Imatech Cyprus, and ArmorPIPE failed to exercise reasonable care or

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

1   competence in obtaining and communicating this information to NGM.

2         98.    Based on the material representations of IM&T, Imatech Cyprus, and ArmorPIPE

3   regarding the durability and life span of the ArmorPIPE 9200, NGM selected the ArmorPIPE 9200

4   for the boreholes at L4 and L5.

5         99.    Contrary to the representations of IM&T, Imatech Cyprus, and ArmorPIPE, the

6   ArmorPIPE lining failed after approximately one year in service.

7        100.    As a direct and proximate result of the negligent misrepresentations of IM&T,

8   Imatech Cyprus, and ArmorPIPE, NGM has suffered damages, including property damage to L4

9   and L5 boreholes presently exceeding $6,500,000 for which IM&T, Imatech Cyprus, and

10   ArmorPIPE are jointly and severally liable.

11   **PRAYER FOR RELIEF**

12        **WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment against

13   Imatech and in favor of Plaintiff, and grant the following relief:

14       A.    For general and special damages in excess of $6,500,000.00;

15       B.    For pre-judgment and post-judgment interest at the maximum legal rate;

16       C.    For the cost of suit and attorneys' fees incurred by Plaintiff herein; and

17       D.    For such other and further relief as the Court may deem just and proper.

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

1

## **DEMAND FOR JURY TRIAL**

2           Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

3    by jury on all issues so triable.

4    DATED:  October 12, 2020.

5                                                             McDONALD CARANO LLP

6

7                                                             */s/ Matthew Addison*
                                                             Matthew Addison, Esq. (NSBN 4201)
8                                                             Sylvia Harrison, Esq. (NSBN 4106)
                                                             Sarah Ferguson, Esq. (NSBN 14515)
9                                                             100 West Liberty Street. 10th Floor
                                                             Reno, NV 89501
10                                                            Telephone: (775) 788-2000
                                                             Facsimile: (775) 788-2020
11                                                            maddison@mcdonaldcarano.com
                                                             sharrison@mcdonaldcarano.com
12                                                            sferguson@mcdonaldcarano.com
                                                             *Attorneys for Plaintiff*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of McDonald Carano LLP and on the 12th day of October, 2020. I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using the CM/ECF system which will automatically e-serve the same on the attorney set forth below, and I also caused a true and correct copy of the foregoing document to be served by email upon the following attorney via the email address listed below:

James E. Whitmire, Esq.
Santoro Whitmire
10100 W. Charleston Blvd., Suite 250
Las Vegas, NV  89135
JWhitmire@santoronevada.com

_/s/ Nancy A. Hoy_____
Nancy A. Hoy

**INDEX OF EXHIBITS**

| <u>**Exhibit**</u> | <u>**Description**</u> | <u>**Pages**</u> |
|---|---|---|
| A | February 19, 2015 Purchase Order | 4 |
| A-1 | General Terms and Conditions | 12 |

4826-8147-1949, v. 1

# EXHIBIT A

# FEBRUARY 19, 2015
# PURCHASE ORDER

# EXHIBIT A



**Newmont USA Limited**

## Purchase Order Change 3000780516

| Version Number : | | Order Date : | Feb 19, 2015 |
|---|---|---|---|

**Newmont USA Limited**

6363 South Fiddlers Green Circle

Greenwood Village 80111 , US

| Supplier: | 14003336 | Ship To: | CARLIN MAIN WAREHOUSE |
|---|---|---|---|
| | IMATECH SYSTEMS CYPRUS PTY LTD | | 6 MILES NORTH OF CARLIN |
| | FLAT 601-602/61-63 LORDOU VYRONOS STR | | CARLIN , NV |
| | LARNACA , | | 89822 |
| | CY | | |

| | | | Plant | : | 1100  Carlin Chukar |
|---|---|---|---|---|---|
| **Attention :** | | | **Buyer** | : | Debra Carone |
| Ph | : | | Ph | : | 775-635-6688 |
| Fax | : | | Fax | : | |
| Email | : glennm@armorpipe.com.au | | Email | : | debra.carone@newmont.com |
| **Payment Terms** | : Within 7 days Due net | | | | |
| **Inco terms** | : DAP_LEEVILLE PASTE BACKFILL | | **Currency** | : | USD |
| **Header Texts** | :- PROJ | | | | |

| **Header Text** | : | Direct Delivery Leeville Mine Paste Backfill Project |
|---|---|---|
| | | att:  Albert Keim or Sandeep Arya |

| **Shipping Instruction :** | PO NUMBER MUST ACCOMPANY SHIPPING DOCUMENTATION ATTN SANDEEP |
|---|---|
| | Newmonts customs broker, Kuehne Nagel, will file for inbound clearance |
| | on Newmonts behalf.  K+N will pay the HMF <(>&<)> MPF ($4789 + $485) to |
| | US Customs.  Their contact information is listed below: Please insure |
| | they are listed as the notify party on the bill of lading for ocean |
| | transport. Once goods are ready to ship, please provide a copy of the |
| | bid of lading and commercial invoice to Newmont. |
| | Kuehne + Nagel, Inc. |
| | 3120 W California Ave STE A |
| | Salt Lake City, UT 84104 |
| | |
| | Ph +1 801 973 2888 |
| | Fx +1 801 746 1178 |

SO Number :        3000780516

**Terms of Delivery** :   Please coordinate deliveries with 24 hour advance notice to
Albert Keim
T 775.778.2777
M 775.397-8159;
albert.keim@newmont.com

Sandeep Araya at
T 775.778.2119
T 775.778.2003 (Alternate Office phone)
M 775.385.3304
Sandeep.arya@newmont.com

**Terms of Payment** :   20% DOWN
30% ON RECEIPT OF APPROVED DRAWINGS
40% ON NOTICE OF READINESS TO SHIP
10% ON RECEIPT OF GOODS
ALL INVOICES TO BE PAID WITHIN 7 DAYS

Please issue your invoices and back-up documentation via email to
debra.carone@newmont.com and Sheilagh.long@newmont.com.

This will facilitate the Project Administrator being able to validate
and complete processing of your invoice for payment.

**Delivery** :   Truck delivery driver shall use all required PPE, which includes a hard
hat, safety glasses with side shields, hard toe shoes that at least
cover the ankle, long pants and a reflective safety vest or reflective
jacket, skirt. The driver shall follow the escort's instructions and
stay clear during unloading. Absolutely no pets are allowed on Newmont
property. Deliveries will be accepted from 7:00 am to 3:00 pm Monday
through Friday.

**Vendor Memo** :   Changed Purchase Order

| Item | Qty | UOM | Delivery Date | Unit Price | Price Per Unit | Total Line Value |
|------|-----|-----|---------------|------------|----------------|------------------|

SO Number :      3000780516

| Item | | | Qty | UOM | Delivery Date | Unit Price | Price Per Unit | Total Line Value |
|------|---|---|-----|-----|---------------|-----------|----------------|------------------|
| 00010 | **Description** | : TURF SURFACE BOREHOLE CERAMIC PIPE | 1 | AU | Jul 1, 2015 | 2,272,189 | 1 | 2,272,189 |
| | **Comments** | : Purchase Req: 1000916631 / 00010 ; | | | | | | |
| | **Storage Location** | : CARLIN MAIN | | | | | | |
| | **Item Texts** | :- | | | | | | |
| | **Item Text** | : 1 AU =1 AU | | | | | | |
| | | Total Qty=1AU | | | | | | |

| Line No | Service | Service Detail | Qty | UOM | Gross Price |
|---------|---------|----------------|-----|-----|-------------|
| 10 | | 8" SCH 80 X 11'THREADED FLUSH JOINT M/F | 13,785 | EA | 1.00 |
| 20 | | 8" SCH80 X 10' THRD FLUSH JOINT M/F 163 | 2,193,654 | EA | 1.00 |
| 30 | | 8" SCH80 X 3' THRD FLUSH JOINT F/PL | 4,292 | EA | 1.00 |
| 40 | | 8" SCH80 X 10' PIPE STUB END | 14,017 | EA | 1.00 |
| 50 | | 8" SCH80 X 3' THRD FLUSH | 5,829 | EA | 1.00 |
| 60 | | 8" SCH80 X 90 DEG BEND CL900 | 16,008 | EA | 1.00 |
| 70 | | 8" SCH80 90 DEG BEND W CL600 | 14,759 | EA | 1.00 |
| 80 | | 8" SCH80 X 3' TRANSITION SPOOL | 5,829 | EA | 1.00 |
| 90 | | 8" SCH80 X 3' TRANSITION SPOOL | 4,016 | EA | 1.00 |

** Schedule lines changed **

| Item | | | Qty | UOM | Delivery Date | Unit Price | Price Per Unit | Total Line Value |
|------|---|---|-----|-----|---------------|-----------|----------------|------------------|
| 00020 | **Description** | : W LEEVILLE SURFACE BOREHOLE CERAMIC PIP | 1 | AU | Jul 1, 2015 | 1,476,285 | 1 | 1,476,285 |
| | **Comments** | : Purchase Req: 1000916631 / 00020 ; | | | | | | |
| | **Storage Location** | : CARLIN MAIN | | | | | | |
| | **Item Texts** | :- | | | | | | |
| | **Item Text** | : 1 AU =1 AU | | | | | | |
| | | Total Qty=1AU | | | | | | |

| Line No | Service | Service Detail | Qty | UOM | Gross Price |
|---------|---------|----------------|-----|-----|-------------|
| 10 | | 8" SCH80 X 9' THRD FLUSH JOINT | 9,564 | EA | 1.00 |
| 20 | | 8" SCH80 X 10' THRD FLUSH JOINT M/F 136 | 1,405,696 | EA | 1.00 |
| 30 | | 8" SCH80 X 3' THRD FLUSH JOINT F/PL | 3,846 | EA | 1.00 |
| 40 | | 8" SCH80 X 10' PIPE STUB END | 12,293 | EA | 1.00 |
| 50 | | 8" SCH80 X 3' THRD FLUSH | 5,238 | EA | 1.00 |
| 60 | | 8" SCH80 70 DEG BEND | 13,644 | EA | 1.00 |
| 70 | | 8" SCH80 90 DEG BEND | 13,807 | EA | 1.00 |
| 80 | | 8" SCH80 X 3' TRANSITION SPOOL | 5,601 | EA | 1.00 |
| 90 | | 8" SCH80 X 3' TRANISTION SPOOL | 5,516 | EA | 1.00 |
| 100 | | 3' BOTTOM PIPE UNLINED 2 EA | 1,080 | EA | 1.00 |

SO Number :        3000780516

## Service Order Summary

| Total Number Of Items : | 0002 | Total Value : | 3,748,474  USD |
|---|---|---|---|
| | | (Exclusive of Taxes) | |

Terms and Conditions :

a) Currency on the invoice must match the currency on the Service Order and only one Service Order per Invoice.

b) Contact the individual Buyer named on Page1 of this order for any proposed variations.

> Upon execution of this Service Order by both the Newmont-related entity named at the top of page one (Newmont) and the entity designated as Supplier on page one (Supplier ), Newmont and Supplier are creating a contract consisting of (a) the specific information set forth in this Service Order, and (b) Newmont's standard service terms and conditions, as set forth at http://www.newmont.com/en/terms and specifically designated as Nevada Service Order Terms and Conditions (Online Terms), which Online Terms are incorporated herein by this reference. Notwithstanding the foregoing, if a separate written agreement, signed by both Supplier and Newmont and specifically covering the services provided for in this Service Order, is in effect, the Online Terms shall not apply, no signatures shall be required below, and the terms and conditions set forth in such other agreement shall govern this Service Order.

Supplier:                                                     Newmont:

By:_____          By:_____
Print Name:_____          Print Name:_____
Title:_____          Title:_____

v.2.13.12

# EXHIBIT A-1

# GENERAL TERMS AND CONDITIONS

# EXHIBIT A-1

**PURCHASE TERMS AND CONDITIONS**

"Agreement" means the Purchase Order, which is incorporated herein by this reference, together with these Purchase Terms and Conditions.

"Effective Date" means (a) with respect to an electronic Purchase Order, the date on which Supplier electronically accepts such electronic Purchase Order in accordance with the acceptance terms set forth therein, and (b) with respect to a printed Purchase Order, the "Order Date" set forth at the top of page one of such printed Purchase Order.

"Newmont" means (a) with respect to an electronic Purchase Order, the entity listed as the "Sold-to-Party" in the Partner Information box in such electronic Purchase Order, and (b) with respect to a printed Purchase Order, the Newmont-related entity named at the top of page one of such printed Purchase Order.

"Purchase Order" means either an electronic Purchase Order or a printed Purchase Order, in either case as issued by Newmont and executed or otherwise legally accepted by both parties and which references and incorporates these Purchase Terms and Conditions, together with any statement of work, scope of work, work order, or similar type of ancillary contractual document that is attached or linked thereto and executed or otherwise legally accepted by both parties.

"Supplier" means (a) with respect to an electronic Purchase Order, the individual or entity to whose SRM Portal account such electronic Purchase Order has been posted, and (b) with respect to a printed Purchase Order, the entity designated as "Supplier" on page one of such Purchase Order.

In consideration of the mutual promises and conditions contained in this Agreement, including the definitions set forth above, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **TERM.**  This Agreement shall be effective commencing as of the Effective Date and continuing until the last to occur of delivery of all Goods or completion of all Services; provided, however, that if Supplier delivers no Goods and never commences Services, then this Agreement shall terminate one year from the Effective Date (the "Term"), unless terminated earlier as permitted herein.  The Term may only be extended by a written agreement between the parties.

2.      **GOODS.**

2.1      Supplier shall sell to Newmont, and Newmont shall purchase from Supplier, the goods, articles, or materials specified in the Purchase Order ("Goods").  The transactions with respect to Goods which are effected pursuant to this Agreement shall be deemed "sales of goods" under the Uniform Commercial Code.  Supplier shall not send to Newmont any goods, articles, or materials which are not authorized by the Purchase Order.  Newmont objects to the inclusion of any different or additional terms by Supplier in Supplier's acceptance of this Agreement, and Newmont's willingness to proceed with the transaction set forth in this Agreement is expressly made conditional upon Supplier's acceptance of the terms of this Agreement.  If Supplier includes or attaches any different or additional terms in Supplier's purported acceptance of this Agreement, commences performance of any Services, or tenders Goods, a contract shall result upon the terms and conditions as stated in this Agreement, without inclusion of any different or additional terms or conditions.  Supplier shall not substitute, or ship more or less than the quantity of, Goods, or perform services in addition to the Services, specified in the Purchase Order without the prior written approval of Newmont.  All Goods shall be subject to inspection by Newmont at all reasonable times for progress and conformance with the requirements of this Agreement.  Supplier expressly grants Newmont the right to access, during normal business hours, all facilities and premises wherein the Goods are manufactured or prepared for the purposes of such inspection.

2.2      Supplier warrants and covenants to Newmont that (A) all Goods shall be, at the time of delivery to Newmont and for the time period specified in the Purchase Order (the "Warranty Period"): (I) as described and specified in this Agreement, including in compliance with the standards of quality specified in the Purchase Order or, if none are so specified, with those specifications which are customary in the industry for similar goods; (II) free of defects in design, materials, construction, and workmanship and of standard quality for the industry unless otherwise agreed in a written document signed by Newmont; (III) in compliance with all applicable laws, regulations, decrees, codes, ordinances, resolutions, or other acts of any applicable governmental authority, whether federal, regional, state, county, local, or other governmental agency (collectively, "Laws"); and (IV) fit for their intended purpose, and (B) Supplier shall have good and marketable title to all Goods, free and clear of any and all liens, restrictions, reservations, security interests, claims and encumbrances at the time title to such Goods passes to Newmont pursuant to the provisions of this Agreement.  If no Warranty Period is specified in the Purchase Order, the Warranty Period shall be 18 months from Newmont's acceptance of the Goods, determined as provided in Section 7.1, or 12 months from the date such Goods are placed in regular operation, whichever is earlier.

2.3      Supplier shall package all Goods in accordance with the packaging specifications set forth in the Purchase Order.  If no such specifications are set forth in the Purchase Order, Supplier shall package all Goods in such a manner as to ensure preservation of such Goods during transportation and storage, having due regard for the conditions and environment at the areas through which the Goods will traverse and be delivered, including climate, roads, and requirements for multiple handling.  In packaging, marking and transporting Goods, Supplier shall abide by all Laws regarding the transportation of the Goods and the protection of safety, health and the environment.  All hazardous Goods shall be clearly labeled.  If the Goods include or constitute dangerous, hazardous or toxic items, Supplier shall include Material Safety Data Sheets and clearly mark or label the Goods with appropriate information, provide necessary shipping certification and otherwise comply with all shipping Laws.  Supplier shall ensure that all packaging, invoices, and bills of lading indicate the applicable country of destination, point of destination, Purchase Order number, description and quantity of Goods enclosed, names of Supplier and Newmont, and such other information as may be customary in the industry for packaging of similar goods.  Costs arising from Supplier's failure to follow required packaging, marking and transporting

1

procedures and instructions shall be at Supplier's expense. If requested by Newmont, Supplier shall give Notice to Newmont of the date of shipping, Purchase Order number, number of transportation units used (railway cars, trucks, containers, or other), bill of lading number, description of Goods, number of crates, and cargo weight, such Notice to be given within such reasonable time period after the Goods are dispatched from their point of origin as Newmont may request.

2.4     Supplier shall deliver the Goods to the location specified in the Purchase Order (the "Designated Location"). If Supplier is to transport or arrange transport of the Goods, Supplier shall do so by such method as is specified in the Purchase Order, and in accordance with any other delivery terms specified in the Purchase Order; provided, however, that if no method is specified in the Purchase Order, Supplier shall transport Goods by such method as is customary in the industry for transportation of similar goods. Newmont's count shall be accepted as final and conclusive on shipments not accompanied by Supplier's itemized delivery docket/packaging list. All Goods received in excess of the number specified in the Purchase Order shall be subject to return for credit at Supplier's cost. Costs arising from Supplier's failure to follow required shipping instructions shall be at Supplier's expense. Supplier shall comply with the delivery time requirements set forth in the Purchase Order. If no delivery time requirements are specified in the Purchase Order, Supplier shall deliver Goods by such time as is customary in the industry for delivery of similar goods via the delivery method used. Delivery terms for Goods shall be as specified in the Purchase Order. Supplier shall not deliver any Goods ahead of schedule except upon Newmont's request.

2.5     If Goods are to be used or consumed by Supplier, or incorporated into a project or other work, in connection with other work being performed for Newmont by Supplier ("Consumable Goods"), the risk of loss of such Consumable Goods shall remain with Supplier until such Consumable Goods are used or consumed by, or the project or work has been completed to the satisfaction of Newmont by, Supplier. Otherwise, risk of loss of Goods shall remain in Supplier until Newmont's physical receipt of Goods at the Designated Location. If, pursuant to warranty or otherwise, Supplier repairs any Goods, at the Designated Location or anywhere else, risk of loss in such Goods shall pass back to Supplier when the repair work commences or Supplier takes possession of the Goods for such repair work, whichever is earlier, until the repair is complete and the Goods returned to the Designated Location and the Goods are safely reinstalled and accepted by Newmont, whereupon risk of loss will pass again to Newmont. Risk of loss shall transfer as set forth in this Section 2.5 notwithstanding any contrary risk of loss transfer typically associated with any Incoterm specified in the Purchase Order; provided, however, that if the Purchase Order specifically states that risk of loss shall transfer in accordance with the stated Incoterm, then that provision shall control.

2.6     Title to Goods shall pass to Newmont upon the earlier of (A) payment in full by Newmont for such Goods, (B) receipt by Newmont of such Goods at the Designated Location, or (C) incorporation of such Goods into any premises owned, operated, or otherwise controlled by Newmont ("Newmont Premises"). Supplier shall clearly identify Goods as property of Newmont by conspicuously marking or tagging, and Newmont shall have the right to inspect and verify that Goods have been identified as Newmont's property.

3.     **SERVICES.** The provisions of this Section 3 shall apply **only if** the Purchase Order specifies delivery, installation, maintenance, or other services incidental to the Goods to be provided by Supplier (the "Services").

3.1     Supplier shall perform the Services and, except as otherwise specified in the Purchase Order, Supplier, at its sole expense, shall provide all labor, supervision, materials, equipment, consumables, insurance, transportation, and such other items and services as are necessary to perform the Services, and shall be solely responsible for demobilization, job site cleanup, and disposition of all residual materials once Services are completed. Supplier acknowledges that Newmont is relying solely on the skill and expertise of Supplier and its employees and agents for proper performance of the Services. Any reviews, inspections or approvals that are required, allowed, or otherwise undertaken by Newmont with respect to any of the Services shall in no way (A) alter Newmont's right and ability to rely on the skill and expertise of Supplier, (B) alter, diminish, waive, or relieve Supplier of any obligation or responsibility under this Agreement, or (C) constitute an assumption by Newmont of any of Supplier's obligations or responsibilities. The period of performance for Services shall be as set forth in the Purchase Order. Supplier shall keep Newmont informed at all times as to the progress of the Services. If Supplier believes that any of the Services will not be completed in accordance with the applicable schedule requirements, Supplier promptly shall give Notice to Newmont of such anticipated delay. Supplier shall, after consultation with and at the direction of Newmont, take such remedial steps as necessary to expedite the Services so that the Services are completed in accordance with such schedule requirements. Supplier understands that performance of the Services may need to be coordinated with Newmont and its vendors and other contractors, and Supplier shall coordinate its performance of Services and otherwise cooperate with Newmont and its other vendors and contractors in this regard.

3.2     Supplier warrants that (A) it is fully competent and possesses the requisite skill, knowledge, resources, experience and expertise to perform the Services in accordance with the standards and the degree of skill and judgment which is normally exercised in the United States mining and metals industry and other relevant industry by those engaged in the performance of services similar in nature to the Services, (B the Services shall be performed in accordance with said standards, skill and judgment, (C) the Services shall be performed in strict compliance with the requirements of this Agreement, including any specifications set forth in the Purchase Order, (D) all Services performed shall be free from defect, (E) Supplier is properly qualified, licensed, trained, organized, and financed to perform the Services, (F), in performing the Services, Supplier shall not install or otherwise cause to exist on any of Newmont's computer systems (hardware or software components) any computer instructions, circuitry, or other technological means whose purpose or effect is to disrupt, damage, or interfere with any Newmont computer facilities or equipment, or to provide unauthorized access to Newmont's computer facilities or equipment, including any code containing viruses, Trojan horses, worms, traps, back doors, disabling devices or like destructive code or code that self-replicates, and (G) Supplier shall comply with Newmont's Computer Use Policy if, in the course of performing the Services, Supplier has access to Newmont's information technology equipment or systems, as such policy may be amended from time to time by Newmont, in its sole discretion, and provided to Supplier.

3.3     Supplier assumes full responsibility for the payment of all wages, payroll burdens, fringe benefits, and payroll taxes as to its employees, servants, and agents engaged in the performance of the Services, including payroll deductions for income tax, workers'

2

compensation premiums, and unemployment insurance.  Supplier shall ensure that Supplier, Supplier's subcontractors, and their respective employees and agents (collectively, "Supplier Parties") at all times have applicable visas, work permits, and other documentation necessary for performance of the Services, and that all immigration requirements applicable to such Supplier Parties are complied with.

3.4        Supplier shall comply with all Laws that are applicable Supplier's performance of the Services, including Laws addressing the preservation of health, safety, and the environment, including the Mine Safety and Health Act of 1977 ("MSHA") and Occupational Safety and Health Act of 1970 ("OSHA"), each as amended, and Supplier shall ensure that each Supplier Party is properly licensed and certified if and as required by Laws, including any MSHA and OSHA certifications.

3.5        Supplier shall perform the Services as an independent contractor in accordance with its own methods, the terms of this Agreement.  Supplier shall have complete charge of its personnel engaged in the performance of the Services.  Individuals employed or subcontracted by Supplier shall not be deemed for any purpose to be an employee, agent, servant, worker, or representative of Newmont and shall not have authority to enter into agreements on behalf of Newmont or otherwise bind Newmont in any manner.  No Supplier Party shall be eligible for any retirement plan, insurance program, or any other employee benefits provided to employees of Newmont.  NO SUPPLIER PARTY SHALL BE ENTITLED TO ANY BENEFITS ON ACCOUNT OF OCCUPATIONAL ACCIDENTS NOR TO ANY OTHER WORKERS' COMPENSATION, LABOR RIGHTS BENEFITS, OR SIMILAR BENEFITS PROVIDED BY NEWMONT TO ITS EMPLOYEES.  It is not the intent of the parties to create, nor shall this Agreement be construed as creating, a partnership, joint venture, employment relationship, agency relationship, or association, or to render the parties liable as partners, co-venturers, or principals.

3.6        Within five days after (A) the effective date of expiration or termination of this Agreement, or (B) if earlier, the completion of all Services under this Agreement, Supplier shall return to Newmont all identification and access badges, codes, VPN tokens, and similar items provided to Supplier by Newmont in connection with the applicable Services (except to the extent the same are applicable to on-going Services).

3.7        Supplier understands that Newmont is committed to conducting all of its mining operations and related activities in an environmentally responsible manner.  To that end, Supplier shall make all commercially reasonable efforts to perform the Services in a manner aligned with such principles, including the use of pollution-controlled equipment and facilities if and as applicable.

3.8        All records, reports, data, and other information, and all copies thereof and notes related thereto, prepared, generated, researched, developed, compiled, or obtained from any source whatsoever by or through Supplier in connection with performance of the Services, including drawings, sketches, specifications, tracings, diagrams, evaluations, calculations, data books, schedules, operating instructions, and requisitions (the "Data"), but specifically excluding any of the same which was in existence as of the Effective Date or which is independently developed after the Effective Date by Supplier, shall be promptly disclosed to Newmont and, without further consideration, shall be, to the extent legally possible, the property of Newmont and are hereby assigned by Supplier to Newmont.  All right, title, and interest in and to all ideas, concepts, know-how, techniques, processes, methods, inventions, discoveries, developments, innovations, and improvements conceived or reduced to practice, whether by Supplier alone or with others, in connection with performance of the Services (collectively, the "Inventions"), but specifically excluding any of the same which was in existence as of the Effective Date or which is independently developed after the Effective Date by Supplier, shall be owned by Newmont, and Supplier hereby sells, assigns, and conveys to Newmont any and all right, title, and interest of Supplier in and to the Inventions, and Newmont shall have the sole and exclusive right to pursue or not pursue patent protection or other forms of protection for the Inventions in the United States or elsewhere.  Supplier shall promptly disclose to Newmont full details concerning each Invention.  All copyrightable subject matter prepared in connection with performance of the Services (but specifically excluding any of the same which was in existence as of the Effective Date or which is independently developed after the Effective Date by Supplier), whether by Supplier alone or with others, and all copyrights therein in the United States and other countries, shall be owned by Newmont.  Each and every work and each and every contribution to a work prepared by Supplier in connection with performance of the Services that is eligible for copyright protection in the United States or elsewhere shall be a work made for hire.  Notwithstanding the foregoing, Supplier hereby sells, assigns, and conveys to Newmont any and all right, title, and interest of Supplier in and to copyrights, including the right to make derivative works and all rights in relation to all mediums of expression now or hereafter known, to any and all works prepared in connection with performance of the Services, including any software, firmware, technical manuals, technical drawings, promotional materials, reports, and product and process specifications.  Supplier shall deliver to Newmont a copy of each and every work eligible for copyright protection, and in the case of software and firmware, Supplier shall deliver to Newmont a copy of the source code and flowcharts reasonably demonstrating operation of the software or firmware. To the extent any deliverable provided to Newmont by Supplier pursuant to this Agreement contains any intellectual property other than Data or Inventions, Supplier hereby grants to Newmont and its affiliates a non-exclusive, irrevocable, fully-paid, global license to use the same for the purpose of conducting Newmont's and its affiliates' internal business operations.  Supplier shall take such further actions, including execution of documents, as reasonably requested by Newmont, and at Newmont's expense, to effectuate the purpose and intent of this Agreement with respect to the rights, ownership, and interests of Newmont provided in this Section 3.8, including cooperation with Newmont to prepare, file, and prosecute patent applications, to enforce patents, and to register and enforce copyrights, as well as to execute assignments, and other documents to establish or evidence Newmont's rights, ownership, and interests hereunder.  Nothing in this Agreement shall be construed as limiting Supplier's ownership of or rights to use its basic know-how, experience and skills, and the experience and skills of its employees, whether or not acquired during performance of the Services, to perform services for any other party.

3.9        If Newmont authorizes Supplier to use any of Newmont's equipment in the performance of the Services, the terms and conditions of this Section 3.9 shall govern such use.  Supplier shall designate in writing those individuals authorized to use Newmont's Equipment to perform the Services (the "Permitted Operators").  The list of Permitted Operators shall be subject to Newmont's approval.  The Permitted Operators shall be authorized to use only that equipment specifically designated in writing by Newmont for use by the Permitted Operators ("Newmont's Equipment") and only for the purpose of performing the Services.  The Permitted Operators shall comply with all restrictions on use of Newmont's Equipment as may be imposed from time to time by

3

Newmont.  Prior to use of Newmont's Equipment, Supplier shall ensure that (i) each Permitted Operator has received hazard, health, and safety training commensurate with the risks to be encountered in using Newmont's Equipment, and (ii) if required by Newmont, each Permitted Operator has received additional training from Newmont's personnel in the safe and proper operation of Newmont's Equipment.  Supplier shall be solely responsible and liable for all damage to Newmont's Equipment incurred during or caused by use of Newmont's Equipment by Permitted Operators.  When required by Newmont, Supplier shall perform maintenance work on Newmont's Equipment in compliance and conformity with the manufacturer's and Newmont's maintenance standards, intervals, and procedures.  Supplier shall be solely responsible and liable for any damage to Newmont's Equipment caused by Supplier's failure to perform required maintenance work.  Prior to any use of Newmont's Equipment, Supplier shall provide evidence satisfactory to Newmont that Supplier's insurance policies as required by this Agreement specifically (a) extend to injury, damage, or loss caused by Supplier's use of Newmont's Equipment, and (b) cover the full replacement value in the event of damage to Newmont's Equipment.  Supplier assumes all risk of and responsibility for any Losses (including injury to or death of any person) caused by Supplier's use of Newmont's Equipment.  Supplier discharges and releases each Newmont Party from any and all Claims and Losses, of any nature whatsoever, relating to Supplier's use of Newmont's Equipment.  Supplier covenants that Supplier shall not at any time in the future, directly or indirectly, commence or prosecute any Claim against any Newmont Party in any way related to Supplier's use of Newmont's Equipment.  The indemnity obligations set forth in Section 14 of this Agreement shall apply with respect to Supplier's use of Newmont's Equipment.

4.    **SITE AND WORKPLACE REQUIREMENTS**.  The provisions of this Section 4 shall apply **only if**, in the course of performing any of the Services, Supplier or any Supplier Party is present on Newmont Premises.  In such event, Supplier shall ensure that it and each Supplier Party present on any Newmont Premises act in strict accordance with this Section 4.

4.1    Supplier shall (A) at all times when Supplier is present on Newmont Premises, comply with the applicable provisions of Newmont's site and workplace policies and procedures, including requirements relating to the areas of health, safety, and loss prevention, in each case, as such policy may be amended from time to time by Newmont, in its sole discretion, and provided to Supplier (including in connection with any job hazard analysis training that may be provided to Supplier's personnel by Newmont), (B) conduct all activities on Newmont Premises so as to avoid or minimize delay or interference with any other person or entity performing work or services, (C) perform the Services only during regular working hours (as communicated to Supplier by Newmont) unless prior written consent is obtained from Newmont, and (D) keep Newmont Premises clean and free of any debris and rubbish caused by the Services and on completion of the Services leave such Newmont Premises clean and ready for use.  Any personnel of Supplier or of its subcontractors whom Newmont deems objectionable shall be removed from the jobsite and from performance of any further Services by Supplier upon Newmont's request without additional cost to Newmont.  Without limiting the generality of the foregoing provisions, if Supplier will be present in any high risk and/or sensitive areas, such as the refinery, carbon handling areas, leach preg ponds, refractory ore treatment plant, or any other area designated by Newmont as high risk and/or sensitive (collectively, "High Risk Areas"):  (I) Supplier shall submit to Newmont's security department's investigating officer a list of Supplier's personnel assigned to work in the High Risk Area, which list shall include each individual's full name and date of birth; Newmont may use such information to obtain a criminal background check on such individuals, the cost of which shall be charged to, and paid by, Supplier; (II) such Supplier's personnel shall report in person to Newmont's security department's investigating officer and may be required to show a driver's license or other government-issued identification, to be fingerprinted, and to sign a release form for security clearance purposes prior to commencement of any Services; and (III) each of Supplier's personnel entering a High Risk Area shall be subject to a high tech metal detector and/or hand scanner detection search for the detection of metals prior to entering a High Risk Area and upon exiting the High Risk Area.  Supplier represents that it has received copies of the following Newmont policies: Social Responsibility Policy; Computer Use Policy; and Conflict-Free Gold Policy.

4.2    While on Newmont Premises (including in any Newmont owned or leased motor vehicles), Supplier Parties shall not (i) possess, sell, manufacture, dispense, or distribute any controlled substance, unauthorized prescription medication, or any other chemical substance that may affect an individual's mood, senses, responses, or motor functions, or may alter or affect a person's perception, performance, judgment, reactions, or senses, including alcohol and medical marijuana (collectively, "Chemical Substances"), (ii) consume or use any Chemical Substance, or (iii) possess any firearm.  Any such individuals who exhibit behavior while on Newmont Premises which gives rise to a reasonable suspicion of consumption or use of a Chemical Substance may be requested by Newmont to submit to one or more Chemical Substance screening tests, to be conducted or otherwise arranged by Supplier and conducted at Supplier's sole expense.  In such event, Newmont will request that the individual review and sign a waiver or consent to test document.  An individual's refusal to sign such waiver or document or refusal to submit to any such screening test will be deemed admission by such individual of consumption or use of a Controlled Substance.  At the request of Newmont, Supplier shall immediately remove from any job site and from participation in any aspect of the Services any of its or its subcontractor's or supplier's personnel that Newmont determines, in its sole, absolute, and non-reviewable discretion, pose a danger to the safety or health of those around them (including because of the individual's violation of the first sentence of this Section 4.2 or are otherwise unfit or incompetent to perform the Services.  If requested by Newmont, Supplier shall conduct drug testing of its employees and agents, and ensure that its subcontractors and, if they have personnel coming onto Newmont's Premises, its suppliers conduct drug testing of their employees and agents, within one month prior to initial admission of such personnel to Newmont Premises for performance of the Services.  Upon Newmont's request, Supplier shall provide to Newmont all appropriate documents showing that Supplier is in compliance with the requirements of this Section 4.2.

4.3    Supplier hereby expressly acknowledges that (A) certain Newmont Premises are operational mine sites, plant sites, exploration sites and/or laboratories which, in the normal course of business, contain certain physical conditions which are, by their inherent nature, dangerous, including blasting operations, open pits, high walls, heavy machinery, high-voltage electrical equipment, and other chemical and industrial hazards ("Inherent Dangers"), (B) it has had the opportunity to undertake any desired investigation of such sites, and (C) it is fully aware of and understands the risks associated with its performance of the Services at a site with Inherent Dangers and hereby assumes all such risks associated with the performance by Supplier Parties of the Services, and the presence of any Supplier Party's invitees, at such a site to the extent the same are caused by any Inherent Danger (collectively, "Assumed Risks").  Supplier (I) discharges and releases Newmont, its affiliates and their respective directors, officers, employees, and agents (each, a "Newmont Party") from any and all losses, settlements, judgments, awards, damages, costs, and other liabilities

(including for injury, bodily or otherwise, to or death of persons and loss, damage to, or destruction of property), (including costs and reasonable attorneys' fees) of any nature whatsoever ("Losses") that Supplier, or any Supplier Party or Supplier invitee claiming through Supplier, may have now or in the future as a result of Assumed Risks; and (II) covenants that Supplier shall not at any time in the future, directly or indirectly, commence or prosecute against any Newmont Party any claims, suits and other actions ("Claims") for Losses incurred as a result of Assumed Risks; provided, however, that the foregoing release and covenant shall not apply with respect to Losses to the extent caused by Newmont's gross negligence or willful misconduct.

4.4      It is possible that Newmont, in its reasonable discretion, may determine that an evacuation of any or all personnel from a Newmont worksite or other work location (a "Site") is necessary for health, safety, or any other reason (an "Evacuation").  Under such circumstances, Newmont generally employs the services of one or more third party contractors ("Evacuation Providers") to carry out all aspects of the Evacuation.  In such event, Newmont shall use reasonable, good faith efforts to notify Supplier of the impending Evacuation and, either at the request of Supplier or of Newmont safety personnel in the event of a safety emergency or at the request of Supplier, medical personnel, or Newmont health and safety personnel in the event of a medical emergency, Newmont shall use reasonable, good faith efforts to notify the Evacuation Providers of the presence of Supplier Party personnel or invitees at the Site and direct Evacuation Providers to provide, at Supplier's sole expense, evacuation services (of a substantially similar type as that provided to Newmont's personnel) to Supplier Party personnel or invitees ("Evacuation Services").  Supplier hereby assumes all risks of and responsibility for any Losses (including damage (property or otherwise), injury, or death), excluding, however, any of the same to the extent caused by the gross negligence or willful misconduct of Newmont, to any Supplier Party personnel or invitees based on or arising out of any Evacuation Provider's provision or lack of provision of Evacuation Services (collectively, "Evacuation Injuries").  Supplier (A) hereby discharges and releases each Newmont Party from any and all Claims and Losses, of any nature whatsoever, that Supplier or any Supplier Party or Supplier Party's invitee claiming through Supplier may have now or in the future as a result of Evacuation Injuries, (B) covenants that Supplier shall not at any time in the future, directly or indirectly, commence or prosecute any action, suit, or other proceeding against any Newmont Party related to the same, and (C) shall indemnify and hold harmless each Newmont Party from and against any and all third party Claims, and shall reimburse each Newmont Party for any and all Losses reasonably incurred by such Newmont Party in connection with investigating, mitigating or defending against any such third party Claims, which Claims or Losses are sustained or incurred by or asserted against any of them and arise out of, in connection with, or are based on allegations, whenever made, related to the Evacuation Services or Evacuation Injuries, excluding, however, any such Claims or Losses to the extent caused by the gross negligence or willful misconduct of Newmont. In addition, Supplier acknowledges that any and all Evacuation Services shall be provided at Supplier's sole cost and expense and Supplier shall be solely liable to Evacuation Providers for all such costs and expenses.  If any Evacuation Providers charge Newmont for provision of Evacuation Services to Supplier Party personnel or invitees, Supplier shall promptly, upon receipt of an invoice from Newmont, reimburse Newmont for the same.  If such charge includes amounts due for services provided to non-Supplier Party personnel/invitees, Supplier shall be responsible only for its pro rata share thereof (based on the number of Supplier Party personnel and invitees evacuated in relation to all personnel evacuated).

5.       **PRICE OF GOODS; FEES FOR SERVICES; INVOICE; PAYMENT.**

5.1      The prices of Goods shall be as specified in the Purchase Order (in each case, the "Price").  Supplier shall not invoice any Goods at any Price higher than that set forth in the Purchase Order without the prior written consent of Newmont.  The Price shall remain firm and fixed for the duration of this Agreement and, unless specifically stated therein, shall not be subject to any escalation, additional charges or any other increases of whatsoever description.  Unless specifically excluded under the Purchase Order and except as otherwise specified in Section 15 below, the Price of Goods shall include all costs, royalties and license fees, taxes, customs duties, fees or charges of any kind incurred by Supplier, including charges and expenses in connection with the packaging, marking, crating, handling and shipping of such Goods and their carriage to the Designated Location.  Supplier shall ensure that the Price charged to Newmont for any Goods is the lowest price charged by Supplier to any purchaser of such Goods.

5.2      If Services are to be performed, as specified in the Purchase Order, the fees for such Services shall be as specified in the Purchase Order (in each case, the "Fees").  Unless otherwise specified in the Purchase Order, the Fees shall remain firm and fixed for the duration of this Agreement and unit and rate based pricing shall not be adjusted irrespective of any variations in the quantity of Services.  If, and to the extent specifically, set forth in the Purchase Order, Newmont also shall reimburse Supplier for the actual amount of reasonable and necessary expenses incurred in the performance of the Services; provided, however, that any individual expense in excess of U.S. $250 must be approved in writing in advance by Newmont in order to be reimbursable.

5.3      Invoice Procedures.

A.       If Supplier is a registered user of Newmont's electronic Purchase Order and Service Order system ("SRM"), Supplier shall invoice Newmont in accordance with the requirements of SRM.  Without limiting the generality of the foregoing sentence, Supplier shall (i) electronically create a service entry confirmation for all Services in SRM prior to invoicing Newmont for such Services, (ii) electronically create an invoice for Services in SRM only after receiving an approved service confirmation from Newmont via SRM, and (iii) electronically create an invoice for Goods in SRM only after receiving an approved goods receipt confirmation from Newmont via SRM.

B.       The provisions of this Section 5.3.B shall apply if Supplier is not a registered user of SRM.  Supplier shall submit invoices electronically, on a monthly basis, to Newmont Accounts Payable at such address as has been provided to Supplier by Newmont.  If Newmont fails to provide such address to Supplier, Supplier shall submit invoices electronically to CorpAP@Newmont.com.  All such invoices must reference the PO or SO Number ("PO#") assigned to the Purchase Order and/or Change Order applicable to the Goods and/or Services.  Invoices shall contain a reasonable itemization of the Goods provided and of the Services rendered and charges made for those Goods and Services and of travel and other expenses incurred.  Copies of receipts, statements, and any other documents that verify the accuracy of such invoice shall also be included.  Services that have been performed at regional Newmont sites must be itemized and will include travel, expenses and services for that specific site or region.  Invoices received that do not comply with invoicing procedures and details set forth above will be rejected and treated as

"disputed" until the invoice is re-submitted correctly. Supplier must correct all invoice compliance issues and resubmit the corrected invoice to the correct address. Payment terms will begin upon the date Newmont receives the corrected invoice, submitted to the correct address. Common invoicing problems to avoid:

- NO PO#: Valid PO# is not listed on invoice.
- PO# COMPLETE: PO# referenced on invoice has been invoiced in its entirety.
- INCORRECT/INVALID PO#: PO# referenced on invoice is incorrect or invalid.
- NO PO LINE #: Invoice contains multiple line items. Invoice line-items must correspond to the relevant line item(s) on associated PO#. For assistance, please contact the individual Newmont Buyer listed in the Purchase Order or such other Newmont contract representative as may be designated in writing by Newmont to Supplier.
- INCORRECT/INVALID PO LINE#: PO# line number stated on invoice is incorrect or invalid.

5.4     Unless different payment terms are set forth in the Purchase Order, payment terms of two percent, 10 days, net 45 days will apply to this Agreement. Payment terms will be computed from the date a correct invoice is received by Newmont; provided, however, that (A) disputed amounts may be withheld pending resolution of the dispute, (B) Newmont shall not be obligated to pay any amounts for Services or Goods if it has not received an invoice for such Services or Goods within 90 days after completion of such Services or delivery of such Goods, and (C) if Supplier fails to comply with its obligations set forth in Section 3.6, above, Newmont may withhold from an invoice any amount reasonably necessary to replace such missing items and revise applicable security access codes and other procedures. Disputed amounts, when reconciled, shall be invoiced and paid as part of the next following monthly invoice. If the parties are unable to reach a mutual reconciliation with respect to disputed invoiced amounts, Newmont shall be entitled to withhold payment of disputed invoiced amounts until such time as a court of competent jurisdiction enters an order, judgment, or other final ruling determining the parties' rights and liabilities, at which time Newmont shall, as appropriate, retain, pay to Supplier, or credit against other amounts owed by Supplier to Newmont the disputed invoiced amounts in accordance with the final ruling.

5.5     Newmont reserves the right to make payments due hereunder directly to suppliers or subcontractors of Supplier if Newmont, in its reasonable discretion, believes that Supplier has not paid or is likely not to timely pay the amounts due to them for Goods or Services provided to Newmont. Supplier shall provide Notice to Newmont within five working days after any occurrence that Supplier believes may give rise to a Claim by Supplier for additional time or money. Failure to give such Notice to Newmont in the manner set forth in this Section 5.5 shall constitute a waiver of any such Claim that Supplier may have. The making of payment shall not prejudice Newmont's right to reject Goods or Services that do not comply with the requirements of this Agreement. Newmont shall have the right to setoff amounts owing from Supplier to Newmont against payment under this Agreement. In addition, if Newmont reasonably believes it might become obligated to pay any amount to a third party or incur other costs, expenses or losses as a result of Supplier's negligence, or failure to fulfill obligations under this Agreement, Newmont shall have the right, in addition to any other remedy available in law or in equity, to setoff and deduct from monies due or to become due to Supplier the sum that is reasonably necessary to cover such amounts, costs, expenses and losses. Any sums so deducted that are subsequently determined to be due Supplier shall thereafter be due and promptly paid to Supplier.

6.     **CHANGE ORDERS.**

6.1     Newmont reserves the right at any time to change, by Notice to Supplier, any of the following: (A) the quantity of Goods; (B) methods of shipment and/or packaging; (C) place and/or time of delivery; (D) scope of the Services; and (E) any other matters affecting the Purchase Order. Any such modification shall be evidenced by a Change Order to the Purchase Order, as issued by Newmont and executed or otherwise legally accepted by both parties (each, a "Change Order"), which shall specify the compensation agreed upon by the parties for such changes. If any Change Order causes an increase or decrease in the cost of, or the delivery schedule for, the applicable Goods or Services, Supplier shall make an equitable adjustment in the applicable Prices, Fees, delivery schedule, or any of the foregoing (an "Adjustment"), subject to Newmont's prior written approval which shall not be unreasonably withheld. Supplier shall submit to Newmont satisfactory evidence (as determined by Newmont in its sole reasonable discretion) from which such Adjustments may be determined. Any claims by Supplier for an Adjustment under this Section 6.1 shall be deemed waived unless asserted to Newmont within 10 days after Supplier's receipt of the applicable Change Order.

6.2     If Newmont reviews and comments on Supplier's technical documents, and implementation of Newmont's comments would cause an increase or decrease in the cost of, or delivery schedule for, the applicable Goods or Services, Supplier shall make an equitable Adjustment, subject to Newmont's prior written approval which shall not be unreasonably withheld. Supplier shall submit to Newmont satisfactory evidence (as determined by Newmont in its sole reasonable discretion) from which such Adjustments may be determined. Any claims by Supplier for an Adjustment under this Section 6.2 shall be deemed waived unless asserted to Newmont within 30 days from Supplier's receipt of Newmont's comments. No Adjustments shall be made under this Section 6 unless Newmont confirms the change in writing.

7.     **ACCEPTANCE; REPLACEMENT GOODS; REPERFORMANCE OF SERVICES.**

7.1     Acceptance of the Goods or any portion of the Services shall be deemed to occur on the earlier of (A) the date on which Newmont notifies Supplier of acceptance, or (B) the date which is 60 days from the date of completion of the Services or delivery of the Goods, as applicable, unless prior to such date Newmont has notified Supplier that it has rejected such Services or Goods or that there is a defect in the Services or Goods. Acceptance of the Services and Goods shall not otherwise be implied or assumed. Newmont's making or failure to make an inspection, examination, or test of, or Newmont's payment for or acceptance of, Goods or Services shall in no way relieve Supplier from its obligation to conform to all of the requirements of this Agreement and shall in no way impair Newmont's right to reject or revoke acceptance of Non-Conforming Goods or Non-Conforming Services or to avail itself of any other remedies to which Newmont may be entitled, notwithstanding Newmont's knowledge of the non-conformity, its substantiality, or the ease of its discovery.

Purchase Terms and Conditions
Nevada/USA
Version (Feb 2014)

7.2     Goods.

      7.2.1     If, in Newmont's sole reasonable determination, Goods do not materially conform to Supplier's warranties set forth in Section 2.2(A), above ("Non-Conforming Goods"). Newmont may either: (A) give Supplier Notice thereof prior to the expiration of the Warranty Period and Supplier shall promptly, at Newmont's option but Supplier's sole cost and expense, (I) repair such Non-Conforming Goods to Newmont's reasonable satisfaction, or (II) replace the same with Goods conforming to Supplier's warranties and compensate Newmont for all costs incurred by Newmont in connection with such Non-Conforming Goods (including freight charges); or (B) retain the Non-Conforming Goods. All repaired and replaced Goods shall themselves be subject to Supplier's warranties set forth in Section 2.2, above, and Supplier's obligations under this Section 7.2 through the end of the original Warranty Period or 60 days from Newmont's acceptance of the repaired or replaced Goods (determined as provided in Section 7.1), whichever is later. If Newmont chooses option (A) and Supplier fails to repair or replace the Non-Conforming Goods within a commercially reasonable period of time (not to exceed 10 days), Newmont may, at its sole option by giving Notice thereof to Supplier, repair the Non-Conforming Goods itself or through a third party or reject such shipment in whole or in part and obtain Replacement Goods pursuant to Section 7.2.2, below. Regardless of which of the foregoing remedies Newmont chooses, Supplier shall be liable for all reasonable costs incurred by Newmont as a result thereof, including labor and freight. If Newmont chooses option (B), Newmont shall have a reasonable amount of time (not to be less than 45 days) to calculate and submit to Supplier a claim for any costs or liabilities incurred as a result of its receipt of Non-Conforming Goods (the "Goods Claim Amount"). Newmont may: (i) deduct the Goods Claim Amount from the invoice amount applicable to such Non-Conforming Goods; (ii) if Newmont previously paid such invoice amount or portion thereof, require Supplier to reimburse Newmont for the Goods Claim Amount; or (iii) setoff the Goods Claim Amount against any other amount owing to or invoiced by Supplier.

      7.2.2     If Supplier fails to supply any Goods or Newmont rejects Non-Conforming Goods in accordance with Section 7.2.1, above, Newmont shall be entitled to purchase replacements for such Goods from a third-party supplier ("Replacement Goods"). In such event, Supplier shall pay to Newmont, promptly upon receipt of Newmont's invoice therefor: (A) the difference, if any, between the higher price paid by Newmont for the Replacement Goods and the Price that Newmont would have paid to Supplier under the terms of the Purchase Order for such Goods; plus (B) an outside purchasing fee of U.S.$50 per Replacement Good, which fee is intended to offset the additional costs to Newmont of having to purchase from a third-party supplier.

7.3     Services.

      7.3.1     If, in Newmont's sole reasonable determination, Services do not materially conform to Supplier's warranties set forth in Sections 3.2(B), (C), and (D), above ("Non-Conforming Services"). Newmont may give Supplier Notice thereof, within 60 days from Newmont's acceptance of such Service, determined as provided in Section 7.1, and Supplier shall promptly, at Supplier's sole cost and expense, re-perform such Non-Conforming Services to Newmont's reasonable satisfaction. Supplier shall, upon receipt of Newmont's Notice, promptly furnish, at no cost to Newmont, all labor, equipment, supervision, and materials at the jobsite necessary to correct the Non-Conforming Services. All re-performed Services shall themselves be subject to Supplier's warranties set forth in Section 3.2, above, and Supplier's obligations under this Section 7.3 for a period of 60 days from Newmont's acceptance of the re-performed Services, determined as provided in Section 7.1.

      7.3.2     If Supplier fails to re-perform the Non-Conforming Services within a commercially reasonable period of time (not to exceed 10 days), Newmont may, at its sole option by giving Notice thereof to Supplier, re-perform the Non-Conforming Services itself or obtain replacement services from another service provider. Regardless of which of the foregoing options Newmont chooses, Supplier shall be liable for all reasonable costs incurred by Newmont as a result thereof, including the difference, if any, between the higher price paid by Newmont for the replacement Services and the Fees that Newmont would have paid to Supplier under the terms of the Purchase Order for such Services. Newmont shall have a reasonable amount of time (not to be less than 45 days) to calculate and submit to Supplier a claim for any such costs or liabilities incurred (the "Services Claim Amount"). Newmont may: (A) deduct the Services Claim Amount from the invoice amount applicable to such Non-Conforming Services; (B) if Newmont previously paid such invoice amount or portion thereof, require Supplier to reimburse Newmont for the Services Claim Amount; or (C) setoff the Services Claim Amount against any other amount owing to or invoiced by Supplier.

8.     **SUPPLIER'S ADDITIONAL COVENANTS.**

8.1     Supplier shall comply with (A) Newmont's Social Responsibility Policy and Newmont's Conflict-Free Gold Policy, in each case, as such policy may be amended from time to time by Newmont, in its sole discretion, and provided to Supplier, and (B) all Laws applicable to this Agreement, including all labor and tax Laws and Laws addressing bribery and corruption.

8.2     Without limiting the generality of Section 8.1(B):

      (A)     Supplier represents, warrants and covenants to Newmont, as of the Effective Date and the date that each invoice is submitted to Newmont, that in carrying out its responsibilities, neither Supplier, nor any of its equity holders, beneficial owners, partners, officers, directors, employees, agents, or representatives shall, directly or indirectly, offer, pay, promise to pay, or authorize the payment of any money, or offer, give, promise to give, or authorize the giving of anything of value: (1) to (a) any official or employee of any government, or any department, agency, or instrumentality thereof, (b) any political party or official thereof, or any candidate for political office, (c) any official or employee of any public international organization (as defined in 22 USC Section 288), or (d) any person acting in an official capacity for or on behalf of such government, department, agency, instrumentality, party, or public international organization, in each case for the purpose of influencing any act or decision of such party, or of such official, employee or candidate in his official capacity, or inducing such official, employee, party or candidate to do or omit to do any act in violation of the lawful duty of such official, employee, party or candidate, or securing any improper advantage, or inducing such official, employee, party or candidate to use his or its influence with a government or instrumentality thereof to improperly or illegally affect or influence any act or decision of such government or instrumentality; or (2) to an officer, employee, agent, or representative

7

of another company or organization, with the intent to influence or reward the recipient's action(s) with respect to his company's or organization's business, or to gain a commercial benefit to the detriment of the recipient's company or organization, or to induce or reward the improper performance of the recipient's duties.

(B)    Notwithstanding any other provision of this Agreement, Newmont may immediately suspend this Agreement in the event it should receive information which, in its sole discretion, it determines to be evidence of a breach by Supplier of any undertaking above.  In the event of receipt of such evidence and/or such suspension, Newmont shall consult with Supplier and may thereafter immediately terminate this Agreement if Newmont, in its sole discretion, is reasonably satisfied that such a breach has occurred.  In the event of such termination, Newmont shall have no liability to Supplier under this Agreement for any fees, reimbursements, or other compensation under this Agreement or for any other loss, cost, claim, or damage resulting, directly or indirectly, to Supplier from such termination, other than for Services already performed and/or Goods already delivered.

8.3      Supplier represents and warrants to Newmont that the following conditions exist as of the date of this Agreement and shall continue to exist during and after the Term:  (A) there is no actual or potential conflict between Supplier's performance of the Services or obligations owed by Supplier under this Agreement and any obligation that Supplier may have to any third party with respect to confidentiality, intellectual property, or otherwise, and (B) Supplier has no current or potential rights that could be infringed or otherwise violated through Newmont's use of the Goods or use of results of the Services.

## 9.      **INSURANCE.**

9.1      Supplier shall procure and maintain at its own expense, during the Term and for such additional periods of time as required below, the following insurance coverage:

9.1.1      Worker's Compensation and Employer's Liability Insurance, covering all claims by or in respect to the employees of Supplier providing:  (I) coverage for the statutory limits as required by applicable laws; (II) sufficient endorsements to extend the full policy coverage to all areas in which operations or Services are to be conducted hereunder (including if applicable, international operations); and (III) Employer's Liability Insurance with minimum limits of U.S. $500,000 for all personal injuries and death in one accident.

9.1.2.      Commercial General Liability insurance, with a limit of not less than U.S. $1,000,000 each occurrence and $2,000,000 annual aggregate.  This Commercial General Liability insurance shall include:  (I) where an exposure exists, explosion, collapse, and underground (XCU) coverage; and (II) cross-liability coverage.  If Supplier's liability policy(ies) does not contain a separation of insured provision, it shall be endorsed to provide cross-liability coverage.

Clauses 9.1.3 through 9.1.7 below, apply only if applicable, as specified within the language of each such clause.

9.1.3      Automobile Liability Insurance, covering owned, non-owned, and hired vehicles which either are used by Supplier on Newmont Premises or are otherwise used in the performance of the Services, covering bodily injury and property damage, with a combined single limit of not less than U.S.$1,000,000 each occurrence; in addition, for all vehicles which will carry Goods which may be categorized as pollutants under Laws, the policy shall also include sudden and accidental pollution coverage for hauled materials resulting from an accident and an MCS-90 endorsement with the appropriate coverage limit for the type of Goods being transported.

9.1.4      Comprehensive Aircraft Liability Insurance, if any of the Services involve use of a chartered or private aircraft, Comprehensive Aircraft Liability Insurance (carried by Supplier or, if Supplier is not the owner of the aircraft, by the aircraft owner), including Passenger Liability without any seat limitation, with limits of not less than U.S.$1,000,000 if Services are to be performed solely in Ghana, Indonesia, or Peru, or U.S.$4,000,000 if Services are to be performed solely outside of the aforementioned countries, per seat, combined single limit for bodily injury and property damage, per occurrence.

9.1.5      Professional Indemnity/Errors and Omissions Liability Insurance, for any of the Services which involve medical, legal, accounting, engineering, or similar types of professional services which are typically insurable under professional indemnity policies, covering liability for financial loss or damage due to an act, error, omission, breach of duty, or negligence resulting from errors or omissions in the delivery of professional services with a minimum limit  per event of U.S.$1,000,000 if Services are to be performed solely in Ghana, Indonesia, or Peru, or U,S.$5,000,000 if Services are to be performed solely outside of the aforementioned countries.

9.1.6      Medical, Accident, and Travel Insurance, covering all Supplier personnel who will travel, in connection with performance of the Services, to any mine site, exploration site, or non-US location, including coverage of any cost associated with comprehensive emergency medical evacuation, treatment, and repatriation, including repatriation of mortal remains and any costs related thereto.  In the alternative, Supplier may choose to not obtain the insurance required by this clause, in which event, Supplier shall indemnify, defend, and hold harmless each Newmont Party against and from any and all Claims and Losses incurred in connection with Supplier personnel traveling, in connection with the performance of the Services, to any mine site, exploration site, or non-US location; provided, however, that the foregoing indemnification shall not apply to the extent such Claim or Loss arises out of or is caused by Newmont's negligence or willful misconduct.

9.1.7      Marine Hull and Protection & Indemnity Insurance, if Supplier is chartering a vessel in connection with performance of the Services, for full loss or damage coverage of not less than the value of the vessel in use.  All chartered vessels must be members of the International Protection & Indemnity Association Group.

9.1.8      Unless otherwise specified in the Purchase Order, Newmont shall arrange Marine Transit and/or Inland Transit Insurance coverage that insures all Goods that are transported by air, sea, or land from any place in the world to the Designated

8

Location. If directed by Newmont, Supplier shall obtain such insurance. This provision shall apply notwithstanding any contrary responsibility for such insurance that may typically be associated with any Incoterm specified in the Purchase Order; provided, however, that if the Purchase Order specifically states that responsibility for such insurance shall be borne in accordance with the stated Incoterm, then that provision shall control.

9.2       The forms of the policies, the companies issuing the same, and all other matters with respect to the adequacy of protection shall be subject to the prior and continuing approval of Newmont. Supplier shall deliver to Newmont, at least five business days prior to commencement of the Services, certificate(s) of insurance for all of the above-required insurance policies containing the following: (A) evidence that coverage is on an occurrence, not claims made, basis (not required for Professional Indemnity/Errors and Omissions Liability Insurance); (B) evidence that Newmont is listed as an additional insured or has its interest noted on the insurance policy with respect to the Commercial General Liability insurance, Automobile Liability insurance, and Comprehensive Aircraft Liability insurance and that Newmont Mining Corporation is listed as an additional insured or has its interest noted on the insurance policy with respect to Comprehensive Aircraft Liability insurance; (C) a statement that the insurance provider has waived subrogation rights with respect to Newmont (not required for Professional Indemnity/Errors and Omissions Liability Insurance); and (D) a statement that the policy will not be materially changed or canceled without at least 30 days' prior Notice, by registered or certified mail, to Newmont.

9.3       The effecting of the insurance set out herein shall not in any way limit, alter, or affect the liability and obligations of Supplier under this Agreement.

9.4       Notwithstanding anything herein to the contrary, any policies written on a claims made basis must provide cover in respect of claims arising out of this Agreement for at least 7 years from the expiration or termination of this Agreement.

9.5       In the event that Supplier is permitted to subcontract any of the Services, Supplier shall require the types of insurance coverage set forth in this Section 9 (or such coverage as may be acceptable to Newmont) from its subcontractors and shall require and ensure that subcontractors certify insurance coverage to Newmont prior to commencement of any Services. In the event that any supplier of Supplier is going to go onto Newmont's Premises in connection with the Services, Supplier shall require the types of insurance coverage set forth in Sections 9.1.1., 9.1.2., and 9.1.3. (or such other coverage as may be acceptable to Newmont) from such supplier and shall require and ensure that such suppliers certify insurance coverage to Newmont prior to commencement of any Services.

9.6       If Supplier fails to effect or keep in force any of the insurance required by this Agreement, Newmont may, but is not obligated to, effect and keep in force any such insurance and pay such premiums as may be necessary for that purpose and may recover as a debt due from Supplier the amount so paid or may deduct the amount so paid from any amount due or becoming due to Supplier, or in the alternative, suspend payment of amounts owed to Supplier until Supplier obtains the required insurance.

9.7       Supplier shall effect all insurance policies required under this Agreement with insurance providers that have a Best rating of B+ XII (or equivalent) or better. Should any insurance company which is providing insurance required by this Agreement fall below a Best B+ XII (or equivalent) rating, Supplier shall promptly give Notice to Newmont and, as soon as practicable, effect coverage with another insurance provider that has a Best rating of B+ XII (or equivalent) or better.

9.8       Supplier may insure or self-insure its tools and equipment as it deems appropriate. Whether Supplier insure or self-insures such tools and equipment, the Supplier hereby releases from liability, and waives all rights of recovery (including rights of subrogation) from and against, each Newmont Party for all loss or damage to such tools and equipment irrespective of the theory upon which any claim is brought. Supplier shall include in all subcontracts a provision equivalent to this Section 9.8 affording each Newmont Party a release from and waiver of liability for loss or damage to subcontractors' tools and equipment.

10.       **TERMINATION.** Newmont may immediately terminate this Agreement at any time, for its convenience, by giving Notice of the same to Supplier, which Notice shall specify the effective date of termination (the "Termination Date"). Upon Supplier's receipt of any such Notice (the "Termination Notice Date"), Supplier shall, unless the Notice requires otherwise, (A) promptly discontinue work on applicable Goods as of the Termination Notice Date, and on applicable Services as of the Termination Date; (B) place no further orders for Goods covered by the terminated documents; (C) promptly make reasonable efforts to either obtain cancellation on terms satisfactory to Newmont of all orders to sub-suppliers for Goods or assign those orders to Newmont; and (D) assist Newmont, at Newmont's expense and upon Newmont's request, in the maintenance, protection, and disposition of Goods already acquired by Newmont under this Agreement. Upon termination by Newmont under this Section 10, Supplier shall be paid: (I) the unit Price for each item of Goods for which title has passed to Newmont in accordance with the provisions of Section 2.6, above, prior to the Termination Date; (II) Supplier's actual costs incurred for Goods in the process of manufacture as of the Termination Notice Date, including unused materials and castings, which are identified to and being manufactured or fabricated specifically and solely as a result of this Agreement, if any; and (III) for the applicable Services performed and related allowable expenses incurred by Supplier through the Termination Date. Notwithstanding the foregoing: (a) Newmont shall not be liable for any Goods which Newmont can show, to Supplier's reasonable satisfaction, are Non-Conforming Goods, for which the provisions of Section 7.2, above, shall control; (b) Newmont shall not be liable for any Services which Newmont can show, to Supplier's reasonable satisfaction, are Non-Conforming Services, for which the provisions of Section 7.3, above, shall control, and (c) the amount payable by Newmont shall not exceed the total Price of Goods or Fees for Services specified in the Purchase Order less any payments previously made thereon by Newmont and shall not, in any event, include any consideration for loss of anticipated profits on the terminated portion of Goods or Services. Supplier shall invoice Newmont for the foregoing allowable charges in accordance with the requirements set forth this Agreement and Newmont shall pay Supplier within 90 days of its receipt of a correct invoice.

11.       **DELAY.** Time is of the essence to this Agreement. The delivery and performance dates specified in the Purchase Order are of critical importance to avoid substantial loss and inconvenience to Newmont. Supplier agrees that such time schedules are reasonable. In the event of delay or anticipated delay in delivery or performance, from any cause, Supplier shall promptly give Notice

9

to Newmont of the delay or anticipated delay and shall undertake to shorten or make up the delay by all reasonable means, at Supplier's sole cost and expense; provided, however, that if such delay results from a Force Majeure Event and Newmont requests that Supplier try to overcome the delay or advance the delivery date, the costs and expenses thereof shall be paid by Newmont to the extent the same are attributable to action authorized by Newmont in advance. Material slippage in Supplier's delivery or performance schedule shall be deemed to be reasonable grounds for Newmont's insecurity, in which event Newmont may demand that Supplier provide adequate assurances that Supplier will perform on time.

12.    **FORCE MAJEURE.** Any of the following shall be deemed a "Force Majeure Event" under this Agreement: governmental regulation, labor dispute, strike, war, riot, insurrection, civil commotion, explosion, fire, flood, storm or any act of God, delay of common carriers, embargo, or other causes beyond a party's reasonable control. Supplier shall not be liable for any delay in delivery or performance of, or failure to deliver or perform, any Goods or Services if such delay or failure is caused by a Force Majeure Event. Where only a part of Supplier's capacity to perform is excused under this Section 12, Supplier shall make a fair allocation of production and deliveries among the various customers then under contract for similar goods or services during the Force Majeure Event period. Newmont shall not be liable for failure to take delivery of Goods or failure to allow performance of Services if such failure is caused by a Force Majeure Event. Supplier shall not be obligated to sell, nor Newmont obligated to purchase, at a later date, that portion of Goods or Services that Supplier is unable to deliver or perform, or Newmont is unable to take delivery of, because of a Force Majeure Event. The party which will be unable to perform its obligation hereunder as a result of a Force Majeure Event shall give the other party Notice within 10 days from the beginning of such Force Majeure Event with reasonably full particulars thereof and the probable extent to which it will be unable to perform or be delayed in performing its obligations. The party giving such Notice shall use its good faith, commercially reasonable efforts to mitigate the effects of such Force Majeure Event as soon as possible after the occurrence thereof. If it appears that a time for delivery or performance will be extended for more than 20 days by reason of a Force Majeure Event, the party receiving Notice under the prior sentence shall have the right to terminate, by Notice to the other party, any portion of the Purchase Order covering the delayed performance and receive a refund of any amounts paid with respect to the obligations not performed.

13.    **GENERAL INDEMNITY.** Supplier shall indemnify, defend, and hold harmless each Newmont Party against and from any and all Claims and Losses, including (A) injury, bodily or otherwise, to or death of persons, (B) damage to or destruction of property belonging to Supplier, Newmont, or others, (C) violation of any Laws, and (D) environmental liabilities, to the extent the same arises out of or are caused by Supplier's breach of this Agreement or any Supplier Party's or Supplier Party's invitee's acts, omissions, or performance in connection with this Agreement; provided, however, that the foregoing indemnification shall not apply to the extent such Claim or Loss arises out of or is caused by Newmont's negligence or willful misconduct.

14.    **INTELLECTUAL PROPERTY INDEMNITY.** Supplier warrants, represents, and covenants to Newmont that all Goods, the sale thereof by Supplier to Newmont, the use thereof by any Newmont Party, the performance of the Services, the use by Supplier of materials, methods, products, or equipment in performing the Services, and Newmont's use of any materials, methods, products, or equipment provided to Newmont by Supplier in connection with the Services do not and will not infringe, directly or indirectly, on any patents or violate any copyrights, trademarks, trade secrets, or any other intellectual property rights ("Third Party Rights"), or cause any Newmont Party to be liable for any fees or royalties arising under any Third Party Rights. Supplier shall, at its sole cost and expense, indemnify, defend, and hold harmless all Newmont Parties from and against any and all Claims of infringement or violation of any Third Party Rights and all Losses related thereto arising with respect to any Goods, the sale to or use thereof by Newmont, the performance of the Services, the use of materials, methods, products or equipment in performance of the Services by any Supplier Party, or Newmont's use of any materials, methods, products, or equipment provided to Newmont by Supplier in connection with the Services. In the event Goods or any part thereof are alleged to infringe or violate any Third Party Rights, at Newmont's request, Supplier either shall obtain, at its sole cost and expense, an irrevocable, license-free license for the applicable Newmont Party to legally use such Goods on the same terms and conditions under this Agreement, shall modify such Goods to be non-infringing but with equivalent functionality and performance, or shall replace such Goods with other non-infringing Goods with equivalent functionality and performance; provided, however, that such license, modification, or replacement shall in no way amend or relieve Supplier of its warranties and obligations set forth in this Agreement.

15.    **TAXES.** Supplier shall be solely responsible for all income, withholding and similar taxes levied upon the remunerations earned by Supplier hereunder. Without limiting the generality of the foregoing, Supplier accepts any and all withholdings that Newmont may be obligated to make, pursuant to applicable law, from compensation payments to Supplier under this Agreement. If Supplier is exempt from any such withholding taxes, it shall make available to Newmont such documentation and other information as may be required by the applicable taxing authority in order to establish Supplier's exemption. Any use, sales, or similar taxes imposed by any governmental authority on or measured by any transaction between Supplier and Newmont pursuant to this Agreement shall be paid by Newmont in addition to the Prices and Fees (unless the Prices or Fees specifically include such taxes, as set forth on the Purchase Order). Supplier shall cooperate with Newmont in opposing the imposition of such taxes on any Goods or Services, the legality of which is reasonably contested by Newmont, and in securing any abatement or refund thereof sought by Newmont. Supplier shall pay all other taxes imposed on any Goods or Services before transfer of title or performance thereof to or for Newmont.

16.    **CONFIDENTIALITY.** Supplier, for itself and on behalf of each Supplier Party and their respective assigns, agrees (A) to treat as confidential and proprietary, (B) not to disclose to others, during or subsequent to the Term, and (C) not to use, except for purposes of performing the Services, without the express prior written consent of Newmont, which consent may be withheld for any reason whatsoever, any information, whether verbal or written, of any description whatsoever (expressly including any technical information, experiments, or data) regarding plans, programs, plants, processes, products, minerals, real property interests, costs, equipment, operations, or customers of Newmont or its affiliates, or which has been expressly identified by Newmont as being confidential in nature, that may come within the knowledge of such Supplier Party in the performance of this Agreement, including all Data and Inventions (collectively, "Confidential Information"). Supplier shall take all necessary precautions, contractual and otherwise, to prevent unauthorized disclosure or use of Confidential Information. Notwithstanding the foregoing, Confidential

Information shall not include any information that: (I) is, or shall have been, in the possession of Supplier and not subject to a confidentiality obligation prior to disclosure thereof to Supplier in connection with this Agreement; (II) through no act or omission of Supplier becomes published or otherwise available to the public under circumstances such that the public may utilize the same without any direct or indirect confidentiality obligation to Newmont or its affiliates; or (III) is acquired by Supplier from any third party rightfully possessed of the same and having no direct or indirect confidentiality obligation to Newmont or its affiliates, with respect to the same; provided, however, that the foregoing exceptions shall not apply with respect to personally identifiable information regarding the employees or agents of Newmont or any of its affiliates or contractors (other than Supplier). All Confidential Information shall be delivered to Newmont upon the termination or expiration of this Agreement, or at any other time upon Newmont's request. Supplier shall not retain copies of Confidential Information without Newmont's express written authorization. Notwithstanding the foregoing, Supplier may retain one archival hard copy of the Confidential Information for such period of time that Supplier normally retains archival hard copies, and such hard copy shall remain subject to this Section 16 until it is destroyed. In addition, if Supplier's computer system automatically retains back-up copies of Confidential Information, Supplier may retain such copies in Supplier's archival computer storage for the period of time that Supplier normally archives backed-up computer records, and such computer copies shall remain subject to this Section 16 until they are destroyed or erased. Supplier acknowledges that Newmont's Confidential Information is an important asset of Newmont and/or its affiliates and that there is not an adequate remedy at law for a breach of this Section 16 and Newmont and/or its affiliates will suffer irreparable harm as a result of such a breach. Therefore, Supplier agrees that Newmont and/or its affiliates, as applicable, shall be entitled to equitable relief, including temporary and permanent injunctive relief without the obligation of posting bond (cash or otherwise), in the event of actual or threatened disclosure or use of Confidential Information in breach of this Section 16.

17.   **ASSIGNMENT: SUBCONTRACTORS**.  The rights and obligations under this Agreement may not be assigned by Supplier without the prior written consent of Newmont, which consent may be denied in its sole discretion. Any attempted assignment without such consent shall be void. If such consent is granted, such assignment shall not increase or alter Newmont's obligations nor diminish or alter Newmont's rights. With respect to any Services to be performed by Supplier, such Services are unique and, therefore, Supplier may not subcontract any portion of its performance thereof to any third party without the prior written consent of Newmont. If Newmont consents to Supplier's use of a subcontractor for the performance of all or any portion of the Services, Supplier nevertheless is and shall remain fully responsible for compliance with all provisions of this Agreement by, and the acts and omissions of, such subcontractor and all of its personnel. In addition, Supplier shall ensure that each such subcontractor's agreement requires the subcontractor specifically to comply with the provisions set forth in Sections 3.6, 4, 8, 9, 16, 23, and 24.  This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and permitted assigns.

18.   **GOVERNING LAW**.  This Agreement shall be governed by and interpreted in accordance with the Laws of the State of Nevada, excepting Nevada law pertaining to choice of law or conflicts of law or any other laws, rules, regulations and case law that would result in the application of laws of a jurisdiction other than the State of Nevada. The parties hereby submit to the jurisdiction of the state and federal courts in the State of Nevada and agree that the state and federal courts in the State of Nevada shall be the exclusive forum for the resolution of any dispute related to, arising out of, or arising under this Agreement, whether based in tort, contract, or other legal theory.

19.   **NOTICES**.  All notices and other required communications under this Agreement ("Notices") shall be in writing, and shall be sent to the addresses set forth below, if to Newmont, and to the Supplier's address as set forth in the Purchase Order, if to Supplier. A party may change its Notice address by sending Notice to the other party of the new address. Notices shall be given: (A) by personal delivery to the other party; (B) by facsimile, with electronic delivery confirmation received; (C) by registered or certified mail, return receipt requested; or (D) by express courier (e.g., DHL, Federal Express, etc.).  Notices shall be effective and shall be deemed delivered:  (I) if by personal delivery, on the date of the personal delivery; (II) if by facsimile on the date stated in the electronic confirmation, delivered during normal business hours (8:00 a.m. to 5:00 p.m. at recipient's location), and, if not delivered during normal business hours, on the next business day following delivery; (III) if solely by mail, on the date of receipt as stated on the return receipt; or (IV) if by express courier, on the date signed for or rejected as reflected in the courier's delivery log.

Notice address for Newmont:

**[NAME OF NEWMONT ENTITY WHICH IS PARTY TO THIS AGREEMENT]**
1655 Mountain City Highway
Elko, NV  89801
Attn:  Contracts Department
Fax Number:  (775) 778-4750

With a copy of any Notice of breach of this Agreement by Newmont or other legal Notice to:

Newmont USA Limited
6363 S. Fiddler's Green Circle, Suite 800
Greenwood Village, CO 80111
Attn:  Legal Department
Fax Number:  (303) 837-5810

20.   **ENTIRE AGREEMENT: AMENDMENT: SEVERABILITY: WAIVER: CONSTRUCTION**.  This Agreement constitutes the complete and entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes, merges, and voids all negotiations, prior discussions, and prior agreements and understandings, whether written or oral, relating to the subject matter hereof.  This Agreement may not be altered or amended except by a document executed, or otherwise legally accepted, by each party.  Should any clause or provision of this Agreement be held or deemed unenforceable or illegal by any court, the remaining provisions of this Agreement shall survive and be fully enforceable as if the illegal or offending provision was never

11

included herein.  Any waiver hereunder by a party of a right or entitlement shall be effective against such party only if in a writing signed by such party, and any such waiver shall be effective only with respect to the particular matter to which it relates and shall not be a continuing waiver.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

21.     **SURVIVAL**.  All provisions of this Agreement which, by their general terms, reasonably may be interpreted as being intended to survive the expiration or termination of this Agreement, shall so survive.

22.     **EXPORT LAWS**.  Supplier shall notify Newmont in advance if any item or information to be provided to Newmont by Supplier under or otherwise in connection with this Agreement is subject to United States or any other country's export control laws and, upon Newmont's request, shall provide Newmont with all information it has which relates to the export controls applicable to such item or information (e.g., information relating to applicable jurisdiction and classification determinations).

23.     **PUBLICITY**.  Supplier shall not make news or media releases or issue other advertising pertaining to this Agreement or otherwise referencing the name or logo of Newmont or any of its affiliates without first obtaining the written approval of Newmont.

24.     **AUDIT AND RECORD RETENTION**.  Supplier shall maintain a copy of records and documentation related to all Goods and Services, including correspondence, directions, subcontracts, and associated Change Orders, document submittals, test records and orders, meeting minutes, transmittals, plans, drawings, specifications, books, accounts, accounting records, receipts, vouchers and other memoranda of any description related to this Agreement (collectively "**Purchase Order Documentation**").  With respect to accounting records, Supplier shall maintain a true, correct, and complete set of records, including books and accounts, prepared in accordance with generally accepted accounting principles consistently applied, relating to the costs and, if reimbursable, expenses for which Supplier seeks compensation or reimbursement under this Agreement, including time expended by Supplier and payments to any subcontractors and suppliers or as may otherwise be necessary for proper financial management under this Agreement, as well as all other records relating to the Goods or Services which may be required by applicable legal requirement (e.g., hazardous material handling records).  Such records shall be made available to audit, inspect, and copy by Newmont or its designated representative during the Term and for a period of five years following termination or expiration of this Agreement, upon 24 hours' prior Notice, and during business hours (8:00 a.m. to 5:00 p.m. where the records are kept); provided, however, that Newmont shall not have audit rights into any fixed rates, agreed-upon percentage multipliers or lump sum amounts.  Upon termination or expiration this Agreement, and at Newmont's request, Supplier shall deliver, as a condition precedent to final payment, all Purchase Order Documentation requested by Newmont within 30 days after receiving Newmont's request.

25.     **PRECEDENCE**.  These Purchase Terms and Conditions, the Purchase Order, and any Change Orders are intended to be complementary and shall be interpreted and construed as complementary, whenever possible.  In the event, however, of any contradiction, discrepancy, ambiguity, or inconsistency between such documents, the following order of precedent shall apply:

1.     Sections 1 to 25 of these Purchase Terms and Conditions;
2.     Change Orders, if any; then
3.     the Purchase Order.

**\\END OF DOCUMENT//**